1  DEBORAH S. MALLGRAVE, State Bar No. 198603
     *DMallgrave@GGTrialLaw.com*
2  JOSHUA M. ROBBINS, State Bar No. 270553
     *JRobbins@ggtriallaw.com*
3  GREENBERG GROSS LLP
   601 South Figueroa Street, 30th Floor
4  Los Angeles, California 90017
   Telephone: (213) 334-7000
5  Facsimile: (213) 334-7001

6  MICHAEL G. FINNEGAN, State Bar No. 241091
     *Mike@AndersonAdvocates.com*
7  JENNIFER E. STEIN, State Bar No. 300775
     *Jennifer@AndersonAdvocates.com*
8  JEFF ANDERSON & ASSOCIATES
   11812 San Vincente Boulevard, #503
9  Los Angeles, California, 90049
   Telephone: (310) 357-2425
10 Facsimile: (651) 297-6543

11 Attorneys for Plaintiff SOCHIL MARTIN

12

13 **UNITED STATES DISTRICT COURT**

14 **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

| | |
|---|---|
| 16 SOCHIL MARTIN, | Case No. |
| 17          Plaintiff, | **COMPLAINT FOR:** |
| 18      v. | 1. Involuntary Servitude (18 U.S.C. § 1584) |
| 19 LA LUZ DEL MUNDO, an unincorporated association, NAASÓN | 2. Forced Labor (18 U.S.C. § 1589) |
| 20 JOAQUÍN GARCÍA, an individual, EL CONSEJO DE OBISPOS, an | 3. Trafficking with Respect to Forced Labor or Involuntary Servitude (18 U.S.C. § 1590) |
| 21 unincorporated association, INTERNATIONAL BEREA USA, an unincorporated association, GILBERTO | |
| 22 GARCÍA GRANADOS, an individual, JOSE HERNANDEZ, an individual, | 4. Conspiracy to Violate the Trafficking Victims Protection Reauthorization Act (18 U.S.C. § 1594) |
| 23 UZZIEL JOAQUÍN, an individual, SILVERIO CORONADO, an | |
| 24 individual, AURELIO ZAVALETA, an individual, JOSE LUIS ESTRADA, an | 5. Obstructing Enforcement of the Trafficking Victims Protection Reauthorization Act (18 U.S.C. § 1590(b)) |
| 25 individual, JONATHAN MENDOZA, an individual, ALMA ZAMORA DE | |
| 26 JOAQUÍN, an individual, BENJAMIN JOAQUÍN GARCÍA, an individual, | 6. Benefitting Financially from Trafficking in Persons (18 U.S.C. |
| 27 RAHEL JOAQUÍN GARCÍA, an individual, ADORAIM JOAQUÍN | |

1  ZAMORA, an individual, DAVID
   MENDOZA, an individual and DOES 1
2  through 10, inclusive.

3              Defendants.

4

5

6

7

8

9

10

§ 1593A)

7.  Unpaid Labor (29 U.S.C. § 201 *et. seq.*)

8.  Unpaid Wages (California Labor Code §§ 1197, 226.7, 1198.5, 203)

9.  Racketeering (18 U.S.C. § 1961 *et. seq.*)

10. Sexual Battery (California Civil Code § 1708.5)

11. Gender Violence (California Civil Code § 52.4)

**JURY TRIAL DEMANDED**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.

Plaintiff Sochil Martin ("Plaintiff") hereby submits this Complaint pursuant to 18 U.S.C. §§ 1589 *et. seq.*, 29 U.S.C. §§ 201 *et. seq.*, 18 U.S.C. §§ 1961 *et. seq.*, and the California Labor Code under federal question and supplemental jurisdiction against Defendants La Luz Del Mundo, Naasón Joaquín García, and all other named and unnamed defendants ("Defendants") and states as follows:

**INTRODUCTION**

1.      This case is about a lifetime of manipulation and abuse of a young woman perpetrated by sexual predators and the global institution built around and for the protection of those predators.

2.      For most of her young life, Plaintiff Sochil Martin has been enslaved, trafficked, and sexually abused by the leaders of La Luz Del Mundo ("LDM"), a global religious institution that has made the economic and sexual exploitation of children and others a centerpiece of its operations for decades.  With over 5 million members in 58 nations on 5 continents, the reach of LDM's criminal enterprise has become vast and entrenched.  LDM has spent the past thirty years expanding their organization into the United States, constructing nearly fifty houses of worship in the state of California alone, including the East Los Angeles church that Ms. Martin was raised in.

3.      LDM controlled every social, educational, and physical decision of Ms. Martin's life, grooming her for a position as an unpaid propagandist for the institution and a sexual servant of its "royal family."

4.      The abuse arrived early and often. When Ms. Martin was nine, her own aunt and foster mother groomed her to serve as an erotic dancer and sexual servant to LDM's self-proclaimed "Apostle," Samuel Joaquín Flores ("Samuel").  Over the next twenty-two years, she was trafficked throughout California and Mexico, was forced to serve Samuel and his son and successor Naasón Joaquín García ("Naasón"), was raped dozens of times, and endured numerous severe beatings, causing physical, emotional, and mental injuries that afflict her still today.

Throughout, she was taught by LDM's leaders that her only value and chance at salvation lay in serving the sexual whims of the two Apostles, which at times included forcing others to have sex with children.

5.    Ms. Martin's servitude was not only sexual. Beginning at age sixteen, she worked an estimated 30,000 or more hours – days, nights, and weekends – without pay for LDM and its affiliated organizations, all while going into extreme debt to meet financial obligations to LDM and while foregoing both a college education and a traditional career.  She did so under threat of severe physical harm, ostracization, financial destruction, and spiritual damnation.  Much of her coerced and unpaid labor involved producing LDM propaganda via its U.S.-based communications arm.

6.    Ms. Martin was far from LDM's only victim.  Both before and after she escaped from the organization, she witnessed or learned of hundreds of other children and young women subjected to sexual abuse at the hands of the LDM leadership, often in horrific circumstances.  She also saw and heard of hundreds of fellow LDM members who were similarly exploited for unpaid labor under coercive conditions.  Both sexual abuse and forced labor are systematic practices that have been institutionalized within LDM for decades.

7.    Naasón and his father did not act alone.  In abusing Ms. Martin and others, they were actively assisted by various members of LDM's senior leadership, including the members of the elite "Consejo de Obispos" (Council of Bishops), who furthered their own privileged positions within the organization by providing the "Apostles" with young children – including their own relatives – for sexual exploitation, and by perpetuating the widespread use of unpaid labor to enrich themselves, the Apostles, and LDM itself.

8.    When Ms. Martin eventually began her escape from LDM at the age of thirty and began cooperating with law enforcement to uncover and stop the ongoing trafficking and abuse, the organization responded first by trying to buy her silence

1   and then, when that failed, by launching a virulent public smear campaign against
2   her and sending one of its infamous "enforcers" to stalk and threaten her at her
3   undisclosed residence.

4     9. Ms. Martin brings this action both to end LDM's longstanding cycle of
5   abuse and retaliation, and to seek redress for the decades of physical, emotional, and
6   financial harm to which the group and its leaders subjected her.

7   **JURISDICTION AND VENUE**

8     10. This Court has federal subject matter jurisdiction over this action
9   pursuant to 28 U.S.C. § 1331 because it arises under the Trafficking Victims
10  Protection Reauthorization Act (18 U.S.C. §§ 1589 *et. seq.*), the Fair Labor
11  Standards Act (29 U.S.C. §§ 201 *et. seq.*), and the Racketeer Influenced and Corrupt
12  Organizations Act (18 U.S.C. §§ 1961 *et. seq.*).

13    11. This Court has supplemental jurisdiction over all asserted state law
14  claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to,
15  and arise from, the same common nucleus of operative facts from which the federal
16  claims arise and, therefore, they form part of the same case or controversy under
17  Article III of the United States Constitution.

18    12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a
19  substantial part of the events and omissions giving rise to the claims occurred in this
20  District.

21  **THE PARTIES**

22    13. Plaintiff Sochil Martin is a citizen and resident of California.
23  Ms. Martin was a minor, United States citizen, and resident of the state of California
24  at the time that she first became a victim and survivor of Defendants' sexual abuse
25  and trafficking.  During the twenty-two years of her abuse, trafficking, and unpaid
26  labor at the hands of Defendants, Ms. Martin has been a resident of various cities
27  throughout the state of California as well as a resident of various locations in the
28  country of Mexico.  As a direct and proximate result of Defendants' wrongful

conduct, Ms. Martin has suffered, and will continue to suffer, physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages.

14.     Defendant La Luz Del Mundo ("LDM"), headquartered in Guadalajara, Mexico, with at least fifty locations in the state of California, is an unincorporated association conducting business as a religious institution in the United States, with affiliates operating in more than fifty countries worldwide.  LDM, at all times relevant to the events that form the basis of this Complaint, has also done business in California as "Iglesia Del Dios Vivo Columna y Apoyo De La Verdad."  Many, but not all, individual locations of LDM within California have registered with the California Department of Justice as Charitable Trusts.  Many, but not all, individual locations of LDM within California have registered with the Secretary of State as incorporated entities.

15.     Defendant LDM has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations of LDM, Defendant el Consejo de Obispos, and Defendant International Berea USA, d/b/a Casa Cultural Berea USA ("CCB").  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds for Defendants LDM and Naasón, the organization of mandatory pilgrimages to the Guadalajara headquarters, and the issuance of behavioral and commercial directives for LDM members worldwide.

16.     Defendant LDM orders the creation and design of all locations of the LDM institution within global regions determined and governed by Defendants Naasón and el Consejo de Obispos.  Defendants LDM, Naasón, and el Consejo de Obispos have exclusive authority to create, appoint, assign, reassign and retire all ministers, deacons, and bishops of the LDM institution.

17.     Defendant LDM had direct control of the operations of Defendants el Consejo de Obispos and CCB at all times relevant to the events that form the basis

of this Complaint.  Defendant LDM benefitted directly from the trafficking and unpaid labor of Ms. Martin, and had both the knowledge and authority to cease the conditions of Ms. Martin's abuse.

18.    Defendant LDM's Mexican counterpart maintains multiple corporate registries within the country of Mexico, as well as registered real estate and communications entities.  LDM also possesses many registered trademarks and copyrights within Mexico.  LDM employs its own general counsel, and has recorded corporate policies and procedures related to myriad subjects, including the allocation of shares, handling of corporate funds, and a mandatory reporting policy for sexual abuse within LDM.

19.    Defendant Naasón Joaquín García is a United States citizen, currently detained in the Los Angeles Men's Central Jail.  At all times relevant to the events that form the basis of this Complaint, Defendant Naasón regularly traveled between Mexico and California, residing in California for extended periods while conducting business in California on behalf of Defendant LDM.  Defendant Naasón's conduct that forms the basis of his personal liability to Ms. Martin (including, but not limited to, his actions related to trafficking Ms. Martin between the United States and Mexico and his personal financial benefit from Ms. Martin's unpaid labor) primarily occurred in Los Angeles, California.

20.    Before December 14, 2014, Defendant Naasón held a senior position within the unincorporated association of Defendant LDM as the son of the prior "Apostle," Samuel Joaquín Flores.  Prior to December 14, 2014, Defendant Naasón oversaw Defendant LDM's efforts to expand its membership and media penetration into the United States, residing for extended periods in the state of California. Defendant Naasón had exclusive control over the operations of Defendant CCB during Ms. Martin's unpaid employment with Defendant CCB.

21.    Defendant Naasón, at various times relevant to this Complaint, served as minister of various LDM California locations, including at the East Los Angeles

and Pasadena locations, located at 112 North Arizona Avenue, Los Angeles, California and 385 East Orange Grove Boulevard, Pasadena, California, respectively.  During his residence in California, Defendant Naasón perpetrated a series of abuses against Ms. Martin, including an extended pattern of physical, sexual, and psychological abuse, aided by Defendant Naasón's conduct of trafficking Ms. Martin and benefitting from her unpaid labor.

22.     Defendant Naasón, since December 14, 2014, has held the position of "Apostle" within the unincorporated association of Defendant LDM, additionally holding the titles of "International Director" and "President" of LDM and affiliated associations.  Through the authority and trappings of these titles, Defendant Naasón was able to direct and benefit from the trafficking and unpaid labor of Ms. Martin.

23.     Defendant International Berea USA, d/b/a Casa Cultural Berea USA ("CCB") is an unincorporated association that holds itself out as a non-profit entity designed and organized by defendant Naasón in 2009 for the purpose of broadcasting LDM's doctrine, including services, Bible studies, temple inaugurations, addresses from Apostles (including Naasón), and important events. Defendant CCB maintains offices throughout the state of California and the United States, with, upon information and belief, a principal place of business at 127 North Kern Avenue, Los Angeles, California – adjacent to the East Los Angeles location of LDM at 112 North Arizona Avenue, Los Angeles, California.

24.     Defendant CCB directed and benefitted from the trafficking and unpaid labor of Ms. Martin, propagating film and other media products filmed, produced, and directed by Ms. Martin.

25.     Defendant el Consejo de Obispos (translation, Council of Bishops) is an unincorporated association that holds itself out as the administrative and ministerial executive board of unincorporated association LDM.  El Consejo de Obispos constitutes the upper echelon of LDM leadership.  Upon information and belief, members meet four or five times a year in the United States and elsewhere,

1  usually coinciding with major religious festivities, with or without the attendance of

2  the Apostle.  Membership of el Consejo de Obispos is determined by the Apostle,

3  and with his guidance, el Consejo de Obispos oversees operations of LDM.  During

4  all times relevant to the events that form the basis of this Complaint, a branch of el

5  Consejo de Obispos operated in and for the United States regions of LDM.  From its

6  position of power, el Consejo de Obispos had knowledge of and benefitted from the

7  trafficking and unpaid labor of Ms. Martin.

8       26.    Defendant Gilberto García Granados is a Mexican citizen who, upon

9  information and belief, regularly resides in the United States for extended periods in

10  his role as a bishop of LDM.  Granados is a constituent member of el Consejo de

11  Obispos.  From his position of power, Granados had knowledge of and benefitted

12  from the trafficking and unpaid labor of Ms. Martin.

13       27.    Defendant Jose Hernandez, upon information and belief, is a United

14  States citizen and California resident.  Hernandez is a bishop of LDM and a

15  constituent member of el Consejo de Obispos.  At certain times relevant to this

16  Complaint, Hernandez served as the minister of the East Los Angeles location of

17  LDM located at 112 North Arizona Avenue, Los Angeles, California.  From his

18  position of power, Hernandez had knowledge of and benefitted from the trafficking

19  and unpaid labor of Ms. Martin.

20       28.    Defendant Uzziel Joaquín, upon information and belief, is a United

21  States citizen and California resident.  Uzziel is a son of the Apostle Samuel and

22  brother to Apostle Naasón.  Uzziel is also a bishop of LDM and a constituent

23  member of Defendant unincorporated association el Consejo de Obispos.   From his

24  position of power, Uzziel had knowledge of and benefitted from the trafficking and

25  unpaid labor of Ms. Martin.

26       29.    Defendant Silverio Coronado, upon information and belief, is a

27  California resident.  Coronado is a bishop of LDM and a constituent member of

28  Defendant unincorporated association el Consejo de Obispos.  At certain times

1   relevant to the basis of this Complaint, Coronado worked in an executive role with

2   Defendant CCB in the Redlands, California location of LDM.  From his position of

3   power, Coronado had knowledge of and benefitted from the trafficking and unpaid

4   labor of Ms. Martin.

5           30.     Defendant Aurelio Zavaleta, upon information and belief, is a

6   California resident.  Zavaleta is a bishop of LDM and a constituent member of

7   Defendant unincorporated association el Consejo de Obispos.  From his position of

8   power, Zavaleta had knowledge of and benefitted from the trafficking and unpaid

9   labor of Ms. Martin.

10          31.     Defendant Jose Luis Estrada, upon information and belief, is a

11  California resident.  Estrada is a bishop of LDM and a member of LDM's executive

12  treasury in the United States, known as el Tesorería.  Estrada held a position of

13  leadership with Defendant CCB, acting for certain times relevant to the basis of this

14  Complaint as Ms. Martin's direct employment supervisor.  From his position of

15  power, Estrada had knowledge of and benefitted from the trafficking and unpaid

16  labor of Ms. Martin.

17          32.     Defendant Jonathan Mendoza, upon information and belief, is a

18  California resident.  Mendoza is a bishop of LDM and a constituent member of

19  Defendant unincorporated association el Consejo de Obispos.  Mendoza held a

20  position of leadership with Defendant CCB, acting as co-Director with Defendant

21  Naasón for certain times relevant to the basis of this Complaint.  From his position

22  of power, Mendoza had knowledge of and benefitted from the trafficking and

23  unpaid labor of Ms. Martin.

24          33.     Ms. Martin is ignorant of the true names of the defendants sued herein

25  as Does 1-6, inclusive, and therefore sues these defendants by such fictitious names.

26  Ms. Martin will amend the Complaint to allege their true names when ascertained.

27  Ms. Martin alleges that, at all relevant times herein, Does 1-6 were the wives and

28  agents of constituent members of Defendant el Consejo de Obispo, each named in

their individual capacity as Defendants herein.  Ms. Martin alleges that each of the fictitiously named defendants is legally responsible for the actions forming the basis of this Complaint and that Ms. Martin's losses and damages are the result of their wrongful conduct.

34.     Defendant Alma Zamora de Joaquín, upon information and belief, is a United States citizen who regularly resides in California and Texas.  Zamora is the wife of Defendant Naasón.  As an immediate family member of the Apostle, benefitting from his and LDM's financial and social successes, Zamora had knowledge of and benefitted from the trafficking and unpaid labor of Ms. Martin.

35.     Defendant Benjamin Joaquín García, upon information and belief, is a United States citizen who regularly resides in California and Texas.  Benjamin is the brother of Defendant Naasón.  As an immediate family member of the Apostle, benefitting from his and LDM's financial and social successes, Benjamin had knowledge of and benefitted from the trafficking and unpaid labor of Ms. Martin.

36.     Defendant Rahel Joaquín García, upon information and belief, is a United States citizen who regularly resides in California and Texas.  Rahel is the sister of Defendant Naasón.  As an immediate family member of the Apostle, benefitting from his and LDM's financial and social successes, Rahel had knowledge of and benefitted from the trafficking and unpaid labor of Ms. Martin.

37.     Defendant Adoraim Joaquín Zamora, upon information and belief, is a United States citizen who regularly resides in California and Texas.  Adoraim is the son of Defendant Naasón.  As an immediate family member of the Apostle, benefitting from his and LDM's financial and social successes, Adoraim had knowledge of and benefitted from the trafficking and unpaid labor of Ms. Martin.

38.     Defendant David Mendoza, upon information and belief, is a citizen of the United States who has engaged in acts obstructing enforcement of the Trafficking Victims Protection Reauthorization Act in San Diego, California.  Upon information and belief, David Mendoza is a direct report to Defendant Naasón,

1  operating as a strong man and known within LDM leadership and to Ms. Martin as

2  "The Enforcer."

3      39.    Ms. Martin is ignorant of the true names of the defendants sued herein

4  as Does 7-10, inclusive, and therefore sues these defendants by such fictitious

5  names.  Ms. Martin will amend the Complaint to allege their true names when

6  ascertained.  Ms. Martin alleges that, at all relevant times herein, Does 7-10 held one

7  or more assets for named defendants as a result of fraudulent transfers.  Ms. Martin

8  is ignorant of the true names of the defendants given the misleading and deliberately

9  deceptive accounting practices of the other named defendants.  Ms. Martin alleges

10 that each of the fictitiously named defendants is legally responsible for the actions

11 forming the basis of this Complaint and that Ms. Martin's losses and damages are

12 the result of their wrongful conduct.

13                          **GENERAL ALLEGATIONS**

14      40.    LDM holds itself out as a religious sect that originated in Mexico

15 around 1926 at the direction of Eusebio Joaquín Gonzalez, known within the sect as

16 "Aaron."  According to LDM, the sect was first founded by Jesus Christ during his

17 lifetime and was subsequently lost after the death of the last of his apostles.

18 Pursuant to these teachings, in 1926, God appeared to Eusebio, and named him

19 "Aaron," the next Apostle, and charged him with restoring the original Christian

20 church (also referred to by LDM as the primitive church).

21      41.    LDM teaches that its Apostle is the only true servant of God, and the

22 only apostle of Jesus Christ in current times.  LDM is led by its Apostle with the

23 coordination of his closest advisors, el Consejo de Obispos, and teaches that

24 salvation can be attained only by following its Apostle.

25      42.    According to LDM, its Apostles are chosen and sent by God.  While

26 succession of the Apostle is by divine calling, leadership of LDM has remained in

27 the Joaquín family since LDM's inception.  When Aaron died in 1964, his son

28 Samuel declared himself the next Apostle.  When Samuel died in 2014, his son,

1   Naasón, declared himself the next Apostle, a position he still holds.

2       43.     As of 1934, LDM has been headquartered in Guadalajara, Mexico.

3   According to its website, LDM has more than 15,000 houses of prayer and has

4   grown to reach 5 million people (baptized) in 58 nations on 5 continents,

5   constituting the second largest religious body in Mexico after the Roman Catholic

6   Church.

7       44.     While LDM holds itself out as a religious sect, it has historically

8   operated as a social, governmental, and commercial institution.  Beginning with the

9   creation of the "Hermosa Provincia" neighborhood in Guadalajara in 1952, LDM

10  has purchased large parcels of land in urban centers that typically house the poorest

11  populations of the community.  LDM then builds its "temples" in the center of those

12  parcels, establishing businesses and housing centers in its vicinity for the residence

13  and employment of its members.  By centralizing its membership, LDM gained

14  political power, directing its membership to vote in civic elections as a "bloc" and

15  thus gaining sway with the local and national political parties.

16      45.     Under the direction of Samuel, and now Naasón, LDM has focused in

17  recent years on the international growth of its associated institutions and political

18  power.  Members are encouraged to emigrate to new countries and build

19  communities that mirror the structure of la Hermosa Provincia in Guadalajara.

20  Members of LDM's inner circle – the Unconditionals – are sent from Mexico to the

21  United States and other foreign countries at the direction of the Apostle, often with

22  the direction to marry local LDM members, establish residency, and have children

23  in order to develop a naturalized LDM membership.  Desirable foreign ministries

24  are then gifted to members of the LDM leadership that have gained favor with the

25  Apostle through the provision of money or attractive women and girls for the

26  Apostle.

27      46.     LDM and Naasón also own and operate numerous business entities in

28  Mexico and around the world, including hospitals and institutions of higher

1  learning.  Members are often expected to both patronize and work at these
2  institutions.  Each institution benefits from the unpaid labor of LDM members.

3  Structure of LDM

4  47.  The Apostle is the spiritual and literal head of LDM.  LDM uses a
5  hierarchal chain of command, with the Apostle at the top, approving everything that
6  happens within LDM.

7  48.  Operations of LDM are managed by the Apostle's inner circle of
8  bishops, who sit on the council of bishops, or "el Consejo de Obispos."  There are
9  separate Consejos de Obispos for operations in Mexico, the United States, and the
10  rest of the world.  Membership in el Consejo de Obispos is at the sole discretion of
11  the Apostle.  Members are chosen due to a combination of familial relation to the
12  Apostle, familial relation to former members of el Consejo de Obispos, a history of
13  raising considerable amounts of money for the Apostle as ministers, or a history of
14  providing desirable young girls and women to the Apostle for his sexual enjoyment.

15  49.  Additional leadership roles are filled by "el Tesorería," or the Treasury.
16  Senior ministers promoted to this group manage the finances for LDM and the
17  Apostle.  As with el Consejo de Obispos, separate Tesorerías exist for Mexico, the
18  United States, and the rest of the world.  Upon information and belief, the vast
19  majority of the funds raised by LDM are collected and delivered to the Apostle, who
20  keeps and spends the funds as he wishes.  Members of el Tesorería direct members
21  of LDM to open bank accounts and purchase properties in their own names with
22  money collected by the Apostle, to hold for his purposes and enjoyment.

23  50.  In addition to el Consejo and el Tesorería, LDM leadership includes a
24  legal team, IT personnel, public relations personnel, and the leadership of the media
25  and propaganda arms of LDM.  The media and propaganda division of LDM in
26  Mexico is called Berea International, otherwise known as Casa Cultural Berea.  In
27  the United States, this branch operates as Berea International USA, d/b/a Casa
28  Cultural Berea USA ("CCB").

51.     CCB was established in the United States in 2009 under the leadership of Naasón.  The purpose of CCB, according to its Facebook page, is to "make the Light of the World Church known through in depth written, photographic, and video coverage of all official activities" of LDM.  In addition, CCB manages LDM's online and social media presences, including active accounts on Facebook, Twitter, YouTube, Instagram, and Pinterest.

52.     Beneath the executive leadership of LDM is a large network of deacons and ministers.  Each LDM location within the United States falls within one of four "regions" – North, South, West, and Central.  Members of el Consejo de Obispos have authority over the individual regions, and serve as ministers of the more prominent LDM locations within their region on a rotating basis.  Naasón and el Consejo de Obispos select ministers for smaller locations in the various regions based on individual pleas by members to "go to the labor" and preach the Apostle's gospel.  There is no single procedure by which a member becomes a minister, and no formal educational requirements to qualify for the position.  Ministers maintain their positions at the discretion of Naasón and el Consejo de Obispos.

Teachings, Doctrine, and Life in LDM

53.     LDM, with roots in mysticism and Pentecostalism, holds itself out as a Nontrinitarian Christian sect that identified its founder Aaron as the first new apostle since the first century.  LDM teaches that the word of God speaks only through the Bible and the Apostle's teachings.  With an emphasis on the old testament and Jewish symbology, LDM preaches that its membership constitutes the "new Israel," elevating the Apostle to a level of "kingship."  Within LDM, the family of the Apostle is referred to with royal titles, with his sons and daughters called "Princes" and "Princesses."

54.     It is from this kingship that the Apostle claims "Solomonic" rights to dictate the behaviors of LDM's membership.  Simultaneously, LDM teaches of the parallel between Jesus Christ and the LDM Apostles, purporting that God not only

speaks to the Apostle, but that the Apostle's word is the very word of God, or "Jesus on Earth."

55.     According to LDM, the only path to salvation is the acceptance of the Apostle as the word of God on Earth.  Aaron preached to his followers that the Christian church had been so perverted from God's will that all followers of the Christian faith since the days of John the apostle had suffered eternal damnation.  Salvation was only accessible through him – the Apostle.

56.     This liturgical premise laid the foundations for an institution with militant discipline that settles for nothing less than absolute loyalty.  Attendance at multiple prayer services each week is mandatory.  Obedience and strict loyalty are demanded in all walks of life, including in education, social relationships, marital choices, political behaviors, and economic participation.  Medical and hygienic practices are dictated by LDM.  Higher education is, for all but a select few, discouraged based on Aaron's teachings that advanced education is the work of the devil.  Those who live in LDM communities, such as la Hermosa Provincia, have their movements regulated by a military-like collection of LDM guards, requiring special permits for extended leave from the community.

57.     The movements and freedoms of women are heavily curtailed by the teachings of LDM.  The Apostle and his ministers preach with regularity of the subservience of women to men.  Women are prohibited from wearing makeup or pants, and must maintain long hair.  For much of LDM's existence, women were also forbidden to have their photograph taken.  In their social lives, female LDM members are prohibited from spending time alone with a man without the permission of their minister, which is nearly universally withheld unless the man is an LDM member or approved by the ministry.  Women sit separately from men within the temple, and must wear a head covering in the temple or at any appearance of the Apostle.  Women are not allowed to serve as ministers or hold leadership roles within the LDM institution.

58.     All LDM members are restricted in their interactions with the non-LDM world around them.  Children of members are often prohibited from engaging in social activities or civic involvement that is not directed by LDM.  LDM ministers direct members to the books, movies, and music that they should consume to maintain their loyalty to LDM.  Ministers preach about the extent to which LDM members should interact with non-members, and warn against developing social relationships with the outside world.  The opportunity for members of LDM to participate in the world around them is restricted most severely by the financial burden imposed by LDM membership.

59.     Services are held three times a day during the week, with two meetings on Sunday, where members hear the Apostle's message and teachings, and required to provide donations.  Each baptized member of LDM (children are baptized at age 14) is expected to give thousands of dollars a year to LDM and directly to the Apostle in various forms.  Donations are required on a regular basis of at least three types:  An income tithing of at least ten percent; a weekly special offering to the Apostle himself; and a weekly "pro templo" contribution to the maintenance of their local temple.  Special offerings to the Apostle are expected to cover the costs of special projects undertaken by LDM as well as a personal gift to the Apostle to demonstrate one's loyalty to God.  Every week, individual temples post lists of the contributions of its members within the temple, encouraging members to compete with one another in showing their love for the Apostle with larger and larger donations, while shaming members who do not give sizable donations.  Among other required donations to LDM are a $2,000 per year contribution for insurance and taxes, temple utilities, pastor stipends, monthly and yearly Apostle gifts, and other specified and required "donations."

60.     Members are also required to purchase certain goods from LDM, including their hymn book and other books, veils and other required dress for LDM services and events, and food items.  The goods are sold by LDM members as well,

who are not paid for their services. The food and many of the goods sold are made by LDM members at their own expense.

61.    LDM members are consistently told by the Apostle, members of el Consejo de Obispos, and their ministers that their contributions pay for the specific costs of LDM and for special projects directed by the Apostle. In Ms. Martin's own experience, when making their payments to LDM, members are given an envelope that specifically explains where their money is meant to go. The ten percent tithing is said to go to the operations of the LDM institution at large, including the costs for operating major LDM festivals and the costs of administering services to their members. The "pro templo" portion of their payment is said to go to paying for the costs of operating their particular temple, including everything from utilities and property taxes to the salaries of their ministers. And the Special Offering to the Apostle always contains a mandatory minimum donation amount, usually with specific descriptions of the projects that the Apostle is undertaking. Only payments above and beyond the amount asked for are unaccounted-for donations meant for use within the Apostle's discretion.

62.    When LDM Members make additional contributions, either in response to particular requests or by purchasing goods or services from LDM, they are almost always given either an explicit explanation or implicit understanding of what the monies will be used for by LDM and the Apostle. However, despite this appearance of structure and transparency, Ms. Martin learned during her time among the LDM elite that the monies given to LDM for any purpose nearly always go directly to the Apostle and his family, which he then distributes in part to el Consejo de Obispos.

63.    Money collected by each LDM location is taken entirely in cash. Money paid to CCB or other branches of LDM selling goods on LDM's behalf is also collected in cash. In each region of LDM, a member of el Consejo de Obispos or el Tesorería who is particularly close to the Apostle is tasked with collecting the cash donations made to each location. Upon information and belief, during all times

Case No.

relevant to the basis of this Complaint, el Tesorería member Defendant Jose Luis Estrada held this role in the Northern Jurisdiction, which contains the state of California.  In Ms. Martin's experience, upon collecting the money, Estrada did not separate out donations based on the purpose indicated on the member's donation envelope, as members thought would happen. Rather, Estrada pooled all of the monies given and brought them to the Apostle's son, Defendant Naasón Joaquín García, who from 2003 until his ascension to Apostle in 2014 served as the Director of the Northern Jurisdiction.

64.    As Ms. Martin witnessed, upon receipt of the monies, Naasón or Defendant Gilberto García Granados would direct Estrada as to how the money should be handled.  Ms. Martin was told that only Naasón and Granados had any authority over the money collected in the Northern Jurisdiction through 2014, and throughout the entire LDM institution after 2014.  Most of the money was deposited in bank accounts held by members of el Consejo de Obispos to be held on behalf of Naasón or the Apostle.  Upon information and belief, these members regularly included Defendants Jose Hernandez, Silverio Coronado, and Aurelio Zavaleta.  The loyalty of these Defendants to Naasón was unquestioned, even earning Coronado one of Naasón's more prestigious nicknames – "faithful dog."  Once deposited in the accounts of the three Defendant bishops, the money could be used by the Apostle, Naasón, or their immediate family members for any purpose.

65.    According to Ms. Martin and other knowledgeable former LDM members, consistently, the donated money is used to fund an extraordinarily lavish lifestyle for the Apostle and his family.  Naasón himself lives a particularly grand lifestyle, which Ms. Martin herself regularly witnessed.  Naasón would often spend over $150,000 on extravagant dinners for his friends, and purchased any number of luxury items for his own personal use, including bespoke designer clothing, flashy cars, Victorian furniture, and expensive art.  In addition to luxury goods, Naasón used LDM donations to fund his own outlandish projects, flying in veterinarians,

architects, and other specialists at great expense to work on projects of his own personal interest.  Naasón uses funds donated by LDM members to pay for his own lavish homes and residences for his children, and to send his children to expensive universities.  Upon information and belief, one of Naasón's sons, Defendant Adoraim Joaquín Zamora, acquired a mansion in Malibu, California, paid for by these contributions of LDM members.

66.     In one instance, members were instructed to make special donations to fund the creation of two ranches for the use of LDM members – one in Redlands, California and one in Seguin, Texas.  In reality, Ms. Martin was informed that Naasón's family already owned the properties and used them for their own personal enjoyment, but sought contributions from LDM members to pay for them.  Members of the Apostle's family, including Naasón's wife, Defendant Alma Zamora de Joaquín, lived on the two properties and enjoyed access to a menagerie of exotic animals either purchased by the family, or presented to the Apostle by members of the LDM elite seeking favor with the Apostle.  The properties house big cats such as lions and tigers, a pet bear, oxen, and hundreds of exotic birds.  The Texas ranch is said to include a private museum of restored vintage cars that have been presented to the Apostles by influential LDM members seeking favor.  Upon information and belief, both the Redlands Ranch in California and the Silver Wolf Ranch in Texas were once owned by Samuel, and are now owned by Naasón's brother, Defendant Benjamin Joaquín.  Each property is believed to be worth well over $2 million. Benjamin is also believed to own a $2.7 million beach-front mansion in Palos Verdes, California, paid for by contributions made to the Apostles.

67.     Upon information and belief, additional funds given to LDM and the Apostle were, at one time, used to fund a localized prostitution ring.  Young girls were trafficked for the purposes of providing sexual services to members of el Consejo de Obispos and other members of LDM leadership.  Naasón would then pay the girls, usually only thirteen or fourteen years of age, for their sexual labor

1    using funds from member donations.

2        68.    Often, the money that is deposited into the accounts of members of el

3    Consejo de Obispos at Naasón's or Granado's direction is used to purchase

4    properties for the use of the Apostle or his family.  The properties are purchased in

5    the name of LDM members, who are forced to take out mortgages on the properties

6    on the promise that the Apostle will pay for the property and that it is a great honor

7    to serve the Apostle and his family in this way.  Naasón often, in turn, rents these

8    properties out to LDM members and others to earn even more revenue for himself

9    and his family.  Ms. Martin personally knows LDM members who have been

10   coerced into taking these steps for Naasón.

11       69.    Cash collected in the United States that is to be sent to Mexico for safe-

12   keeping at the Guadalajara headquarters is laundered across the border.  Naasón and

13   others enlist LDM members to take regular trips to Guadalajara with cash hidden on

14   their bodies and in their luggage.

15       70.    In addition to money donations, LDM members are encouraged to

16   donate their property to LDM and the Apostle.  LDM members are encouraged to

17   sign over their real property to members of el Consejo de Obispos to hold on behalf

18   of the Apostle.  Members who do not have real property to give are encouraged to

19   give other valuable items.  On one occasion that Ms. Martin recalls, LDM members

20   in Southern California were encouraged to donate to the Apostle any gold heirlooms

21   and jewelry that they owned.  The donations were then melted down and used to

22   paint the molding in Naasón's new home in Los Angeles.

23       71.    LDM also forces its members to work in various businesses owned by

24   LDM, including CCB.  Across the board, upon information and belief, LDM's labor

25   force is made up of unpaid LDM members.  The construction of temples and homes

26   for the Apostle and other members of LDM leadership is staffed by unpaid LDM

27   members.  Members provide childcare and housekeeping services to the Apostle's

28   family and the families of el Consejo de Obispos.  Nearly all of the members

working at CCB – cameramen, directors, writers, etc. – are unpaid for their services, which are often full time jobs.  Not only do members receive no compensation for the services that they are forced to provide, but they are also frequently required to pay the expenses associated with the work itself.  For example, members are often forced to provide services in cities not near their homes, and must pay their own travel, transportation, and housing expenses.  If preparing a meal or serving food for the Apostle or a bishop, members are required to provide the food.  Workers at CCB pay for videography equipment out of their own pockets.

72.     Among all of the expensive and time-consuming activities associated with being an LDM member, none are as onerous as the extraordinary festivals held in honor of the three LDM Apostles.  Celebrations are held in Guadalajara, Mexico, to celebrate the birthdays of Aaron, Samuel, and Naasón.  For Samuel's birthday in February and Naasón's birthday in April, members are encouraged to make a pilgrimage to Guadalajara – at their own expense – and to make particularly generous "special offerings" to the Apostle for the occasion.  Aaron's birthday is considered the holiest of holidays in LDM, and is known as the festival of the Holy Supper.  All members of LDM worldwide are expected to make the pilgrimage to Guadalajara for the event.  Any member who cannot attend is expected to give additional money to the Apostle, purportedly to pay for other members to make the trip.  Upon information and belief, this money is never used to bring members who could not otherwise afford the pilgrimage to Mexico for the celebration.

73.     Once at the festival in Guadalajara, members are expected to provide more unpaid labor.  Hundreds of thousands of members descend upon Guadalajara for the festivities, all of which are set up and paid for by the members.  Rafters are built, food is sold, tokens of LDM and the Apostle are made and sold, literature is printed and disseminated, video is taken – all at the expense of and via the unpaid labor of members.

///

74.     These grandiose holidays highlight the centrality of the Apostle's importance to LDM and the taught association between devotion to God and financial generosity to the Apostle.  LDM temples rarely contain crosses or images of Jesus Christ.  Rather, temples and LDM merchandise are emblazoned with the initials of the Apostle, far outstripping in size and prominence any traditional religious iconography.  Where many Christian churches would place an altar or crucifix to focus the attention of worshipers during prayer, LDM temples place a lavish, throne-like chair for the minister, surrounded by the initials of the Apostle. Upon Naasón's succession as the Apostle, temples around the world changed these logos to reflect the new Apostle's initials.  Those initials are now found everywhere; above altars and on temple doorways, on hymnbooks, and across myriad branded merchandise available for sale from LDM – including t-shirts, ties, pins, keychains, pens, and so on.

75.     Such idolatry exemplifies the role of the Apostle as the messenger and "Servant of God" to LDM followers, underscoring the fundamental tenet of the ministry – salvation is available only through worship of the Apostle.  It is from this tradition that members are taught to obey the Apostle no matter what – his word and his actions are as infallible as the words and actions of God himself.  The Apostle is said to be incapable of sin.  Official induction to LDM requires multiple admissions of the Apostle's infallibility over the course of three ceremonies conducted during childhood.  At age thirteen, a "revival" ceremony requires members to show absolute and unquestionable loyalty to the Apostle and admit that they are nothing and their entire life is for the Servant of God.  At this ritual, children are tested to "receive the Holy Spirit" in front of the entire temple community, by kneeling before the Apostle or his minister without speaking or eating – sometimes until their knees bleed.  They can only speak or get up once the Apostle or his minister decides that they have sufficiently demonstrated their devotion to the Apostle.  Once permitted to rise, the children are deemed to have "received the Holy Spirit."  After

receiving the Holy Spirit, members are "presented" to their community in a second ceremony, where they must stand before their temple and declare that they are nothing, and the Apostle is their only chance for salvation.  Finally, at age fourteen, members are baptized.  Only after completing all three ceremonies is a child a full member of LDM.

76.     LDM imposes harsh strictures to maintain obedience and secrecy.  As Ms. Martin has witnessed, ministers use the power of the pulpit to call out an individual member's nonconforming or disobedient behaviors, calling on their family, friends, and other members to persuade them to obey.  Depending on the severity of the offense, members are called upon to speak ill of named offenders, ignore them at services or turn their backs to them, refuse to sell food or other products to them, refuse to patronize their businesses, or even kick them out of their homes.  Ostracization is imposed for offenses as small as going on an unsupervised date or missing services for school functions.

77.     Members who try to leave LDM are cut off entirely from their friends, family, and community.  Members whose spouses leave LDM are instructed to keep their children away from the non-believing parent.  Ministers preach during services that it is a sin to talk to ex-LDM members that have turned their back on the Apostle, and counsel that God will punish LDM members for associating with ex-LDM members.  Leaving LDM, according to their teachings, condemns a person to eternal damnation, and association with such apostates threatens one's immortal soul.

78.     Former members are subjected by LDM leadership to "smear campaigns" by LDM on social media.  LDM will defame former members to their family and friends, often with devastating consequences.  Pictures of former members and their families are displayed for all to see, with directions not to interact with, hire, or do business with the non-believer.  Pictures of former male members with their children are posted with allegations that the former members are

sexual predators.  Children are instructed to isolate the children of former members at school.

79.     Members of the LDM elite who have left LDM or spoken out against its practices have faced far worse than even this detrimental social and economic isolation.  Naasón, and his father Samuel before him, have in their employ a number of "strongmen," who use intimidation and threats of physical assault to enforce absolute obedience to the Apostle.  Stories of these enforcers' tactics are well-known among LDM's elite, and Ms. Martin herself has heard of many disturbing efforts to silence dissenters.

80.     Upon information and belief, one member of el Consejo de Obispos that attempted to leave LDM with his family was beaten so severely at the direction of Samuel that he was left blind in one eye.  Samuel further ordered an attack on the bishop's daughter that led to her being confined to a wheelchair.  Numerous other accounts have been made public of former LDM members who spoke out against the Apostle and were physically attacked and their lives repeatedly threatened.  Upon information and belief, Samuel even ordered a physical attack on one of his own brothers when he threatened to leave LDM.  Ms. Martin has also been told of the attempted murder of an individual believed to have information potentially supporting criminal proceedings against Naasón.

The Unconditionals

81.     Within LDM's membership, an elite group of members exist, known as *Los Incondicionales* (the "Unconditionals").  The Unconditionals were created by Samuel upon his accession to the position of Apostle amidst questions of his spiritual legitimacy.  Samuel was Aaron's youngest son, and Aaron never publicly announced his successor during his lifetime.  Upon Aaron's death, Samuel spread the story of his own apostolic origins, claiming that he was stillborn, taking his first breath only once Aaron lifted his body to God and called upon God to breathe life into him.  Samuel purged from LDM leadership members of his father's "old guard"

that would not minister to this narrative, and designated an elite group of followers as his Unconditionals to preach the story and demonstrate to members the rewards of complete loyalty to his legitimacy as head of LDM.

82.    Members of the Unconditionals today are typically the familial descendants of that initial group designated by Samuel.  Unconditionals are taught an even stricter set of rules and level of obedience and secrecy.  Unconditionals must come before the Apostle himself and declare that their life belongs to the Apostle.  They are his property.  It is a deadly sin to oppose the Apostle's wishes – which extend to where an Unconditional lives, where they work, the services they provide to LDM, which family and friends they interact with, and who they marry. The Apostle controls all aspects of an Unconditional's life.

83.    The marriage of an Unconditional is dictated by the Apostle with strategic purpose.  Marriages are arranged to increase political power, strengthen alliances, and promote LDM's efforts to colonize foreign countries.  Unconditionals are frequently required to marry persons with different citizenship to their own in order to give birth to new LDM members with citizenship in foreign countries that can then spread the membership, and therefore financial reach, of LDM.

84.    Designation as an Unconditional usually occurs shortly after baptism, around the age of sixtee.  New Unconditionals must go before the Apostle and pledge their unconditional loyalty to him, and must sign a letter confirming their acceptance as an Unconditional.  As a child of fifteen or sixteen, the member must say to the Apostle and his audience that "my life is no longer mine.  My life is yours.  My life is in your hands to do as you please.  If I were ever to go against your word, may God strike me from this earth."

Sochil Martin

85.    Sochil Martin was born in 1986 in Monterey Park, California.  She is a third generation Unconditional.  Her mother, and her parents before her, were Unconditionals within LDM.  When Ms. Martin was three, after her mother was

deemed an unfit parent by the state due to drug abuse, Ms. Martin and her three brothers went to live with their aunt, also an Unconditional.  From birth, Ms. Martin was taught to follow and obey the Apostle, and not to question his teachings or messages.  Salvation could only come from strict and "unconditional" following. From her earliest memories, Ms. Martin was a part of the LDM Unconditional community, attending services, special events, making required offerings, and providing other labor as demanded of her by LDM.

86.     Ms. Martin attended public school, but those hours were the only time she was not with the LDM community.  Ms. Martin's time was strictly monitored and she was not allowed to spend time outside of school with friends or others who were not LDM members.  For example, Ms. Martin was not permitted to participate in any after school activities or attend school or extracurricular functions, such as girl scouts, school dances, or sporting events.

87.     When she was nine years old, Ms. Martin's aunt told her that she had been chosen to serve the Apostle, Samuel.  Ms. Martin's aunt told her that this was a special and wonderful blessing, and that she herself had served Samuel when she was younger.  Samuel had many girls of different ages serving him, all brought to him by the men and women of his inner circle.  Members of el Consejo de Obispos and their wives would find attractive young girls and bring them to the Apostle for his entertainment.  If the Apostle approved of the young girls, they would be "groomed" to serve the Apostle by women who knew what the Apostle expected – either because they themselves had served the Apostle or because they were wives of el Consejo de Obispos members.

88.     Ms. Martin's aunt and mother had both served Samuel when they were younger.  When Ms. Martin's aunt brought Ms. Martin to the Apostle, she was trained by his groomers on how to please the Apostle.  At that time, when Ms. Martin was nine, serving the Apostle meant training to serve him not only coffee and meals, but learning choreographed dance routines with other children as

well.  The children performed their dances at LDM services in public, but also performed private, erotic dances for Samuel.  The groomers trained the children for these erotic dances, often providing them with scandalous and revealing clothing to wear during the dances.  The groomers taught Ms. Martin what Samuel liked and did not like, and how and where he wanted to be touched.

89.     As part of her training, Ms. Martin and the other children were given special Bible studies and directed to learn and memorize certain Bible passages that LDM said proved that the Apostle was the Servant of God, incapable of sin.  The children were taught by their groomers that these passages explained why being touched or "loved" by the Apostle was a gift from God and an honor.  Among these passages were quotes from Kings in the Old Testament describing the harem of wives and concubines of King Solomon, used by the groomers as evidence of the power of the Apostle – as the "King" of the "new Israel" – to be surrounded by endless women.  The girls were also taught that passages from the Sermon on the Mount about "stor[ing] up for yourselves treasures in heaven" required them to serve the Apostle in any way asked of them, to provide for their eternal souls.

90.     Once sufficiently "trained," Ms. Martin, at age twelve, was ordered by Samuel's daughter, Defendant Rahel Joaquín García, to travel to an event in Big Bear, California to perform erotic dances for Samuel in revealing clothing. "Princess" Rahel served for many years as Samuel's primary groomer.  When Ms. Martin would object to wearing the revealing outfits that the Princess or her aunt gave to her, Rahel would explain to the young Ms. Martin that LDM members could not contradict the Princess or any member of the "royal" apostolic family, for their orders were the orders of God.

91.     For the next four years, Ms. Martin was expected to regularly serve and dance for Samuel, including private erotic dances in the Apostle's Los Angeles home.  When privately dancing for Samuel, Ms. Martin would caress and touch the Apostle as she had been trained, and allow him to caress and touch her as he

pleased.  Ms. Martin would serve the Apostle in various states of undress.

92.    At age thirteen, Ms. Martin attended her "revival" at the LDM East Los Angeles location to "receive the Holy Spirit."  The ritual was overseen by Consejo de Obispos member Defendant Jose Hernandez, who had known Ms. Martin since she was a child.  Hernandez was Naasón's cousin, and his own daughters had served and then become concubines for the Apostle Samuel.  As was the custom, Ms. Martin knelt before the minister for hours, not eating or speaking.  Her knees bled and legs shook as she waited for bishop Hernandez to tell her that she had received the Holy Spirit.  She listened as she was told by Hernandez that she was nothing and humiliated before other members in the temple.  Hernandez also oversaw Ms. Martin's baptism at age fourteen.  Ms. Martin pleaded with her aunt to not be presented to the church, begging instead to be allowed to play softball with friends from her high school.  But Ms. Martin's aunt forced the young Ms. Martin to be presented.

93.    Once baptized, Ms. Martin was required to start making payments to LDM, though only fourteen years old.  Ms. Martin would sell her belongings at yard sales to come up with the money to make her special offerings to the Apostle.  On one occasion, Ms. Martin was forced to decide between making her payment to LDM or buying required vaccinations for her pet dog.  Her money went to LDM, and the dog was euthanized.  At age fifteen, Ms. Martin started working at her aunt's law firm, answering phone calls and handling paperwork after school.  All of the money that Ms. Martin earned went straight to LDM and the Apostle.  There was nowhere else for the money to go, anyway – Ms. Martin was not allowed a life outside of LDM or friends to go with to a movie or the mall.

94.    Any time that Ms. Martin had left after serving Samuel, working, or going to school was spent either at the LDM temple or working for LDM.  Ms. Martin's aunt would time how long it would take Ms. Martin to get home from school, and then send her directly to LDM for prayers and labor.  Ms. Martin was

put to work by the East Los Angeles LDM location selling goods in the neighborhood.  She would sell hymn books, bibles, personal objects, veils, chocolate bars, and other foods to raise money for LDM.  The proceeds from the sales went directly to LDM and the Apostle, and were not considered part of Ms. Martin's personal donations or special offerings.

95.     When Ms. Martin was sixteen, Samuel's son Naasón was made the minister at the East Los Angeles location of LDM, where Ms. Martin and her aunt attended services.  Naasón had come to Los Angeles with the intention of establishing the United States media and propaganda apparatus of LDM.  The endeavor started as "BereaVision," an LDM radio station that has since developed into CCB.  Naasón instructed Ms. Martin that she was to begin working for him at BereaVision producing his radio programming.

96.     Ms. Martin was required to work tirelessly for BereaVision.  She would go directly to the station after school and work there every weeknight and all weekend, often until eleven in the evening.  While still attending school, Ms. Martin would work more than forty hours a week, and never received any pay for her work, even though CCB distributed time cards and required workers to keep track of their hours.  She would write and record programming for the station, travel to different LDM locations throughout California, and record services to be broadcast on BereaVision.  Naasón would order her to miss school to finish her work, and Ms. Martin would even be told to get notes from doctors associated with LDM to excuse her from classes so that she could work for BereaVision.

97.     Naasón soon added video production to Ms. Martin's obligations, having started an internet streaming channel to broadcast LDM services and events. Consejo de Obispos member Defendant Jose Luis Estrada joined Naasón in CCB activities while ministering at a location in Long Beach, California.  When Ms. Martin did not report directly to Naasón, she reported to Estrada.  Another Consejo de Obispos member, Defendant Jonathan Mendoza, acted as the co-Director of CCB

1 after Naasón.  He too worked out of the East Los Angeles location, and worked

2 closely with Ms. Martin in her CCB activities.

3     98.    Naasón started ordering Ms. Martin to travel to Mexico to tape services

4 and events for CCB.  Naasón's secretary would purchase plane tickets for Ms.

5 Martin, and she would travel to Mexico roughly four times a year.  The trips would

6 usually last for two to three weeks, during which time she worked constantly and

7 missed school.  These trips would correspond with the major LDM religious

8 festivals, which last for several weeks.  During the February festivals, Ms. Martin

9 would often stay in Mexico for three or four weeks.

10     99.    While on these trips, Ms. Martin would produce entire segments for the

11 CCB channel.  This work included, among other things, conducting interviews with

12 LDM members from around the world, arranging interviews with influential

13 politicians, writing scripts for reporters, and reporting on events herself.

14 Additionally, Ms. Martin wrote pieces for the LDM website, reporting on the

15 festivities.  She was given official CCB USA badges, which she has to this day.

16 While Naasón would pay for Ms. Martin's plane ticket to Mexico for these trips, she

17 had to pay for all of her and CCB's expenses during the festivities.

18     100.    When Ms. Martin was back in California, she continued her work

19 producing videos for CCB, and also was required to sell commercial slots on the

20 network.  Other LDM members that worked at CCB assumed that the money raised

21 from the commercial sales was used to fund CCB's operations, as they told

22 Ms. Martin.  Upon information and belief based on Ms. Martin's personal

23 involvement with the process, the money went directly to Naasón.  When new costs

24 arose at CCB, the unpaid workers would spend their own money to meet them.

25     101.    In one instance, Ms. Martin was forced to pay $1,500 of her own

26 money to purchase a camera tripod for CCB.  On another occasion, Ms. Martin

27 spent $1,500 on a drone for CCB.  Neither sum was ever returned to Ms. Martin.

28 Ms. Martin was forced to rely on her LDM-associated family members and LDM

itself for housing, food, and any other financial needs.  Every debt that Ms. Martin took on in service of the church made her only more dependent on her LDM membership, and more susceptible to threats of ostracization.

102.   Ms. Martin was also ordered by Naasón to smuggle cash to Guadalajara during her trips for CCB.  Ms. Martin would be given envelopes of up to $5,000 at a time, and be required to hide the money on her person or in her garment bag to smuggle it to Guadalajara.  This cash was the same cash donated by LDM members, collected by Defendant Jose Luis Estrada.  Naasón would variably enlist Ms. Martin in other unpaid tasks for his benefit outside of her responsibilities at CCB.  When Naasón built his new home in Los Angeles, Ms. Martin was one of many young LDM members required to spend their weekends contributing to its construction and decoration, including painting the new moldings with the melted down gold possessions of LDM members.  Naasón would also take Ms. Martin to the family's ranch in Redlands, where she was required to learn to take care of many of the exotic animals.

103.   The CCB operations were housed in a residential home adjacent to the East Los Angeles location of LDM.  Ms. Martin was forced to spend hours working alone with Naasón in his office.  During these sessions, Naasón would tell Ms. Martin that his relationship with his wife was loveless and that he felt incomplete and unloved.  He would tell Ms. Martin that he "needed a hug" and that "no one loves me."  Based on her trained loyalty to the Apostle and his family, Ms. Martin would tell Naasón that she loved him.  Naasón would tell her that he did not believe that she loved him because she would not hug, kiss, or massage him.

104.   Under these coercive conditions, Ms. Martin began kissing and touching Naasón when he would request it during these private sessions in his office.  Naasón began to pursue Ms. Martin, making comments about her appearance, touching her, complaining that his wife would not have sex with him, and pleading with Ms. Martin to love him, take care of him, and massage him.  In

deference to the "Prince," Ms. Martin would comply, and allow Naasón to touch her in return.  Ms. Martin knew that the Apostle's family received unquestioned loyalty from LDM's many members.  Rejecting Naasón's advances could have cost Ms. Martin her family, her home, and access to any financial security.

105.   When Ms. Martin was seventeen, she and her family were in a tragic car accident.  The Apostle's son, Atlai Joaquín García, was married in Guadalajara, and Ms. Martin and her family attended the wedding.  Atlai asked Ms. Martin's aunt to transport gifts from the wedding back to the United States for him.  With the car overloaded with Atlai's possessions, the car was in a serious accident, resulting in the death of Ms. Martin's younger brother and Ms. Martin suffering a severe vertebral fracture.  Ms. Martin's aunt proceeded to bring a lawsuit against the tire reseller PepBoys for damages incurred in the accident.  Ms. Martin was awarded $50,000 for pain and suffering damages, and two of her siblings were awarded smaller amounts.  Under threat of ostracization and defamation by LDM leadership, Ms. Martin was forced to turn over the entire amount of her damages award to LDM and the Apostle as a special offering.  Ms. Martin continues to suffer from severe back pain and related complications to this day.

106.   When Ms. Martin turned eighteen, she made plans to attend college.  She applied to New York University's film school, and was accepted – information that her aunt and Naasón hid from her.  Instead, Naasón told her that she had to stay close to Los Angeles and continue to work for him at CCB.  He directed her to attend California State University at Northridge and to study communications instead of film.

107.   Once accepted to CSU-Northridge, Ms. Martin received a small scholarship and a $60,000 grant in the form of a loan.  Ms. Martin was directed by LDM to take out the full loan of $60,000.  She was then forced to give the money to Samuel, under similar threats of ostracization and lies damaging to her reputation.  Without the funds from the loan, Ms. Martin was only able to attend classes at CSU-

Northridge until her scholarship ran out after roughly one year.  During that year, she continued to work full time at CCB, and often was required to miss the few classes that she could afford.  Ms. Martin still owes money on the loans today.

108.   During this time, Ms. Martin was also being subjected to sexual abuse at the hands of her uncle.  In an attempt to escape the abuse, Ms. Martin ran away to San Jose, where she stayed with a relative.  While in San Jose, Naasón maintained complete control over Ms. Martin's life.  Naasón called the relative that Ms. Martin was staying with on a daily basis, ensuring that she was attending LDM services and monitoring her social life.  Naasón called the minister of the San Jose LDM location and instructed him to keep Ms. Martin busy with LDM activities and to monitor her behavior.

109.   Even in San Jose, Ms. Martin had to obtain Naasón's permission to make almost any choice.  Naasón had to give permission for Ms. Martin to attend a local school and permission for Ms. Martin to stay with her local relative.  Even though Ms. Martin only stayed in San Jose for roughly three months, she had to seek permission from Naasón to do simple things like cut her hair, wear clear nail polish, or make new friends.  Ultimately, upon Naasón's instruction, Ms. Martin's relative sent her back to Los Angeles to continue serving Naasón.  Ms. Martin continued full time work at CCB, where Naasón continued his pattern of coercing Ms. Martin into touching, kissing, and caressing him.

110.   When Ms. Martin was twenty, she attempted to restart her education by taking classes at Los Angeles Community College.  Naasón came to meet Ms. Martin at the campus in his Range Rover, and asked her to come "take care of him" in his car.  Ms. Martin told Naasón that she was worried about what her aunt would think if she allowed him to have sex with her.  Naasón told Ms. Martin that he dreamed about her being his wife, and that there was nothing wrong with her taking care of the Apostle's son.  He proceeded to have sex with Ms. Martin.

///

111.   For the next several months, Naasón would take Ms. Martin to hotels to have sex.  Naasón would bring Ms. Martin into his private office at CCB to have sex with her, telling her that he was aroused by the fact that others in the office could hear them.  LDM members began spreading gossip about Ms. Martin, disparaging her for sleeping with a married man.  After three months, Ms. Martin felt like she was "in hell."  To discourage LDM members from spreading gossip or accusing Ms. Martin of getting special treatment, Naasón began to publicly humiliate her.  Naasón would disparage her during services in LDM, taking "blessings" away from her in public.  Though Ms. Martin would try repeatedly to get out of the situation, this pattern of sexual exploitation continued uninterrupted for the next five years, with the knowledge of LDM leadership.

112.   Ms. Martin attempted to run away from LDM, Naasón, and her family on a number of occasions.  Ms. Martin told her aunt about Naasón's sexual demands of her, and told her aunt that she wanted to get out of the relationship.  Ms. Martin's aunt told Ms. Martin that she could not deny Naasón's sexual advances, as he was the son of the Apostle, and if she denied him, another woman might take her place who would want to hurt the Apostle.  Ms. Martin spiraled into a deep state of depression, feeling trapped by her sexual servitude to Naasón.

113.   At twenty-one, Ms. Martin attempted to run away from Naasón and LDM to the home of her older brothers in Riverside, California.  Both of Ms. Martin's older brothers were previously forced out of LDM, and according to LDM, were not "suitable" company for Ms. Martin as an Unconditional.  Ms. Martin was suffering from an emotional breakdown due to the years of control and abuse from Naasón and LDM.  She sought refuge with family, and even got a job working at a local restaurant.  However, she was sought out by LDM members and pulled back into attending services.

114.   Naasón, having been informed of Ms. Martin's whereabouts by LDM members, called Consejo de Obispos member Defendant Jose Hernandez – then the

bishop of the Moreno Valley location of LDM.  Naasón asked Hernandez, as a personal favor, to bring Ms. Martin into Hernandez's services.  Despite the long distance between the home of Ms. Martin's brothers and the Moreno Valley LDM location, Ms. Martin was instructed to attend services there so that Naasón's friend Hernandez could keep a close eye on Ms. Martin and report back to Naasón.

115.   Naasón directed Hernandez to find Ms. Martin a place to live away from her brothers.  At first, Ms. Martin was instructed to live in a bungalow on LDM property.  She then moved into the home of a female LDM member from the Moreno Valley LDM location.  However, when she defied instructions not to interact with her brothers in order to attend a family party, Ms. Martin returned to the woman's home to find that she had been thrown out and all of her possessions were strewn about outside of the house.

116.   Ultimately, Naasón came to Ms. Martin's place of work, and ordered her to come back to Los Angeles to continue her servitude to him.  Ms. Martin returned to Los Angeles, moving into an apartment with a friend from high school.  Ms. Martin continued her work at CCB as instructed, and was forced to continue her sexual servitude to Naasón.  Naasón became increasingly aggressive with Ms. Martin.  When having sex with Ms. Martin, Naasón would slap her with a fist on her side, back, and buttocks.

117.   On one occasion, Naasón presented Ms. Martin with a gift of a Gucci watch.  He told Ms. Martin that, in return, she needed to "do something nice" for him.  Naasón took Ms. Martin to a hotel with rooms decorated to accommodate various sexual kinks, including rooms designed to look like a dentist's office or a BDSM dungeon.  Naasón then escorted Ms. Martin to "Déjà Vu" – a strip club – and made Ms. Martin sit with him while he watched women perform strip teases.  Naasón instructed Ms. Martin to ask a dancer in the club if he could touch her.  The dancer told Naasón that Ms. Martin looked too young for him, which deeply angered Naasón.  He drove Ms. Martin back to the hotel, and proceeded to violently

beat and rape her, calling her vicious names and severely injuring her.

118.   Ms. Martin's sexual servitude to Naasón and work for CCB continued uninterrupted in Los Angeles through most of 2010.  Ms. Martin enrolled in classes in a local film school, attempting once again to get the education she had been repeatedly denied by Naasón and LDM.  Yet after only three months of classes, LDM once again upturned her life.  Samuel had become concerned about how well-known his son's sexual exploits had become.  Samuel, who was grooming Naasón to be his successor, did not want to risk the stability of LDM over Naasón's obsession with Ms. Martin.  While the Apostle was infallible and could not sin, Naasón was not yet the Apostle.  Only after Naasón ascended to the position of Apostle would he be free to engage in any manner of sexual exploits without risking the scorn of LDM members.

119.   In October 2010, Samuel dispatched his son and Consejo de Obispos member Defendant Uzziel Joaquín to order Ms. Martin to relocate, while simultaneously reassigning Naasón to minister in the Pasadena location of LDM. Uzziel informed Ms. Martin that she would be required to get married within one month, and that Samuel had chosen her next husband.  Ms. Martin was to marry a relative of Consejo de Obsipos member, Defendant Jonathan Mendoza and Defendant David Mendoza.  The Mendoza family had a long history in the inner circle of LDM, and all of Jonathan's descendants had been presented to Samuel for sexual servitude.  Ms. Martin's intended spouse had himself been having a sexual relationship with the Apostle since he was fourteen.  As Ms. Martin had seen as a servant of Samuel herself, it was not uncommon for members of el Consejo de Obispos to bring their children and grandchildren to Samuel for sexual servitude. Consejo de Obispo member Defendant Silverio Coronado had made the same show of devotion to the Apostle with his own descendants.

120.   Ms. Martin resisted the instruction from Uzziel, asking for more time and the opportunity to choose her own husband.  Samuel relented, giving

Ms. Martin six months to find a potential match for his approval.  Ms. Martin had, on a previous trip to Ensenada with Naasón, met an LDM member that was engaged in local politics, worked with Naasón, and came from a family well-respected in LDM.  Samuel ultimately approved the marriage, and Ms. Martin was nominally married in April 2011.  Unbeknownst to Ms. Martin, LDM failed to file any official paperwork, and Ms. Martin remained legally unwed until late 2019.

121.   In order to fulfill Samuel's order to be married, Ms. Martin had to travel to and remain in Ensenada, Mexico, where her new husband worked for a local council woman.  Ms. Martin soon became pregnant.  Samuel had forbidden any contact between Ms. Martin and Naasón, but LDM continued to control the lives of Ms. Martin and her family.

122.   In Ensenada, Ms. Martin was coerced, once again, into immense amounts of unpaid labor for LDM.  She continued her work producing videos for CCB.  Additionally, she provided labor doing housework for the local pastor and, along with other members, was put to work remodeling the pastor's house.  Additionally, Ms. Martin was called on to provide labor to yet another fraudulent "non-profit" organization run by LDM.

123.   Working hand-in-hand with CCB, LDM had established the Regional Alliance of Student Professionals, or "RASP."  The organization purported to be a youth organization within LDM intended to help youth members continue their education and find professional work.  In reality, as Ms. Martin learned while assisting the operations of RASP, the organization was another LDM racket.  RASP held regular conferences for LDM members, where talks were given by Naasón and other members on professional choices and educational opportunities.  Tickets to these events ranged from $50 to $150.  Attendees were told that the money raised from ticket and LDM merchandise sales would fund a series of scholarships for LDM youth.  In addition, occasional special offerings were demanded of LDM members to support the RASP efforts.  However, the money raised for RASP was

delivered to the Apostle, with, upon information and belief, no scholarships ever being offered.

124.    Ms. Martin was enlisted to help set up and run RASP conferences between 2011 and 2015.  She and other members would provide goods, food, and labor to run the conferences.  Ms. Martin was also expected to give talks at the conferences about careers in film production and direction.  As always, Ms. Martin received no compensation for her work.

125.    Ms. Martin worked full time in her activities with LDM, while raising her child.  Ms. Martin's husband had a job with the local city council that, absent the demands of LDM, could have provided the young family with a comfortable lifestyle.  However, Ms. Martin's family lived in near-poverty, with every available cent going to LDM.

126.    In order to make the required payments to LDM, Ms. Martin and her husband regularly sold their clothes and personal effects in yard sales.  Ms. Martin made clothes for her young daughter, using the same clothes for the growing child for as long as two years.  Ms. Martin and her husband themselves wore hand-me-down clothing, and spent no money for their own purposes, while Ms. Martin's daughter lived in a walk-in closet.  Although Ms. Martin's husband was paid a reasonable income, the young family was forced to borrow money to meet their obligations to LDM.  They were further required to spend what little money they had left over after making their required donations entertaining visiting members of LDM leadership, taking them out for lavish dinners and paying for their accommodations.

127.    In December 2014, Samuel died.  Though Ms. Martin had known for years that Naasón would be named as the new Apostle, it was only at this time that the announcement was made to LDM members.  Naasón, like his father before him, was not the oldest child in the Apostle's family, but LDM assured their membership that he, like his father and grandfather, was chosen by God as his messenger on

Earth.

128.   Naasón began a business relationship with Ms. Martin's husband, working with a non-profit that Ms. Martin's husband had started. Naasón wished to use the non-profit as a vehicle to further benefit LDM. In early 2015, Naasón told Ms. Martin's husband that he required Ms. Martin's presence in Guadalajara.

129.   Ms. Martin was brought to the new Apostle's office in Guadalajara, where she encountered Azalea Rangel Melendez – Naasón's chief secretary and groomer. Azalea informed Ms. Martin that the new Apostle required a private audience with Ms. Martin, and she was directed into his private offices. There, Naasón had set up a laptop with a camera to record the encounter. He proceeded to force Ms. Martin down on his desk and raped her while he videotaped them.

130.   Naasón told Ms. Martin that he required her to continue her service to him as his sexual servant, and that he wanted her to begin locating and grooming new young girls for his personal harem, as Ms. Martin's aunt had done with her. Ms. Martin felt uncomfortable with her new obligations, but remained constrained by a lifetime of conditioning, family pressure, and the knowledge of how she would be hurt if she angered Naasón. Naasón informed Ms. Martin that he did not trust his father's inner circle, and wanted to find an entirely new circle of young girls to serve him. Now that Naasón was the Apostle, LDM doctrine identified him as infallible and incapable of sin. The LDM machine that had trafficked women for sexual servitude to the Apostle for decades now worked for him.

131.   In addition to forcing Ms. Melendez and Ms. Martin to find young girls for his sexual gratification, Naasón enlisted the help of el Consejo de Obispos and their wives to identify young girls and boys that could serve the new Apostle. As Ms. Martin witnessed, in return for providing suitably attractive children for his enjoyment, the members of his inner circle were rewarded with ministries in better LDM locations and lavish gifts, such as handbags and jewelry. Promotion to a superior ministry location was synonymous with financial reward. The "best"

1   ministry locations were those that were large and usually brought in significant

2   donations from their members.  As Ms. Martin learned during her time working in

3   close proximity to Naasón, a small portion of donations to LDM were used to pay

4   the ministers themselves, before the rest of the donations were sent to the Apostle.

5   Thus, in return for trafficking suitable children to Naasón for his sexual enjoyment,

6   members of el Consejo de Obispos and their wives were financially rewarded.

7         132.   Now that Naasón had ordered Ms. Martin to continue her sexual

8   servitude and to take on a role as a groomer, Ms. Martin was forced to travel to

9   Guadalajara for months at a time, leaving behind her husband and small child.

10   While in Guadalajara, Ms. Martin would stay at the Berea house with Naasón,

11   where she was regularly required to perform sexual acts on Naasón and other LDM

12   members for Naasón's enjoyment.

13         133.   While in Guadalajara, Ms. Martin was not allowed to open a bank

14   account.  The only money that she had access to was money that Azalea would give

15   her after a sexual encounter with Naasón to purchase specific items for the Apostle.

16   Ms. Martin would be sent out to purchase sex toys, lingerie, and other clothing for

17   Naasón.  Any money that she did not spend had to be returned, and all of her

18   movements in Guadalajara were monitored.  She was not even allowed to go to the

19   supermarket alone.  On one occasion, she was ordered to purchase a $300 wig for

20   the Apostle that he wore as a disguise while traveling in Mexico City.

21         134.   As the Apostle, Naasón became entirely unlimited in his sexual

22   demands of Ms. Martin and other members of his harem.  When a groomer located a

23   young girl or boy that they opted to present to the Apostle, he would demand

24   pictures of the children before allowing them in his presence.  Once he approved a

25   child to be brought before him, he would require his groomers to take photographs

26   of the children in their underwear.  Upon information and belief, Naasón kept these

27   photographs on various electronic devices, several of which would travel with him

28   between the United States and Mexico.  He would then instruct his groomers to

perform sexual acts on the children while he watched, including performance of oral sex, masturbation, and sodomization with inanimate objects.

135.   Naasón also demanded that his groomers, including Ms. Martin, engage in a large range of sexual exploits with him.  Ms. Martin was forced to engage in many such acts with Naasón, and was told by other groomers of many more.  He forced his groomers to have sex with him, to have sex with each other, and to enlist their husbands to join him in large orgies.  On one occasion, Naasón asked Ms. Martin to have sex with her husband and film it for him, though she was able to avoid complying by stalling and gently resisting.  He also asked Ms. Martin to have sex with him and her younger brother, which she similarly managed to avoid.  He later asked Ms. Martin to film herself having sex with her pet dog, which she also avoided.  Ms. Martin was told by another girl in Naasón's circle that she, too, had been asked by Naasón to film herself having sex with a dog.  Ms. Martin was also told of a groomer that Naasón had ordered to engage in sexual acts with a horse, which left her severely injured.

136.   During this period, Ms. Martin was regularly forced to have sex with Naasón, and sometimes with both Naasón and Ms. Melendez.  On one occasion, Ms. Martin was called into Naasón's office where she found Naasón and a topless sixteen year-old girl.  Naasón ordered her to have sex with both of them.  When Ms. Martin hesitated, Naasón held her down and raped her.

137.   On another occasion, Naasón ordered Ms. Martin to masturbate a fourteen year-old boy while he watched.  Ms. Martin refused.  In anger at her refusal, Naasón severely beat Ms. Martin.  Covered in bruises and unable to feel her right leg, Ms. Martin was not allowed to go to the hospital.  Ms. Melendez provided Ms. Martin with pain medicine and directed Ms. Martin to an LDM member that could provide her with additional injections.  Ms. Martin was later told that when she refused to masturbate the fourteen year-old boy, the boy was forced to have sex with Ms. Melendez instead.  Naasón later forced the boy's mother to have sex with

the boy while Naasón watched.  Naasón taped the incident on a personal electronic device.  The child is a descendant of Consejo de Obispos member Defendant Jonathan Mendoza, willingly given to the service of the Apostle by his family.

138.   After Ms. Martin received this particularly brutal beating, she fell into a deep depression.  She had become despondent watching LDM members willingly and proudly presenting their children and grandchildren to the Apostle to be brutally raped and abused.  Ms. Martin called her husband and asked him to purchase her a plane ticket back to Ensenada.  In Ensenada, Ms. Martin sank deeper into her depression.  She acquired some hydrocodone from her aunt, and took eight pills with alcohol in an attempt to end her life.  She woke up in the hospital, with a distraught husband by her side.

139.   Naasón still would not let Ms. Martin go.  He called her to California, directing her to continue doing work for CCB and scouting for more children for his sexual gratification.  Ms. Martin began travelling twice a month to California to act as his groomer.  Ms. Martin met many children that she knew would please the Apostle, but could no longer bring herself to bring pictures of them to Naasón.  Any time that Naasón and Ms. Martin were in the same place, he forced her to have sex with him, raping her during this time period an average of three times a month.

140.   Concerned about the mental well-being of his wife, Ms. Martin's husband began investigating her behavior.  In October 2016, Ms. Martin's husband discovered photographs and text messages on her phone between Ms. Martin and Naasón.  Armed with the realization of his wife's abuse and exploitation, he confronted Ms. Martin, and extricated her from LDM.  Yet although Ms. Martin, now thirty, was finally starting to escape LDM's grasp for the first time, the organization was not finished inflicting damage on her and her family.

141.   Upon trying to leave LDM, Ms. Martin and her husband were alienated by their entire families.  Naasón and his ministers gave and still give disparaging sermons about Ms. Martin and her husband to LDM members – which LDM

members then relay to Ms. Martin and her husband via social media.  LDM began a terrible smear campaign against the couple, and they received harassing threats online and in-person.  Ms. Martin's husband was tormented at work, with coworkers taking videos of him while making disparaging comments about his wife, calling her a "whore" and a "liar."

142.   In November 2016, out of fear of what Ms. Martin might tell other LDM members or the world about her exploitation and abuse, Naasón dispatched three members of LDM leadership to attempt to buy Ms. Martin's silence.  Rogelio Zamora, Nicholas Menchaca, and Josue Mora approached Ms. Martin with an offer of half a million pesos if she would agree not to discuss her time in LDM.  She did not accept the offer.

143.   In the time since leaving LDM, Ms. Martin has attempted to bring awareness to the abuses and deceptions carried out by LDM leadership.  In October 2018, Ms. Martin began working with United States and Mexican authorities to help in the investigation and prosecution of Naasón, his bishops, and LDM.

144.   Once Ms. Martin's involvement with law enforcement became known to LDM members, LDM redoubled its efforts to smear and alienate Ms. Martin and her family as part of their ongoing attempts to cover up LDM's illegal conduct.  As a result of the disparagement by LDM, Ms. Martin and her family faced endless abuse at their home in Ensenada, Mexico.  LDM members threw firecrackers at their dogs, vandalized their home, popped the tires on their cars, broke in the glass on their windows, and shouted egregious insults at them in public.  Local grocery stores run by LDM members would no longer serve them, and the conditions at her husband's work got even worse.  Photos of Ms. Martin and her family were distributed on social media, along with vague threats.

145.   On or around June 30, 2019, Ms. Martin and her family were accosted by members of Defendant Naasón's criminal defense team in their own home. Ms. Martin was in the kitchen of her family home in Ensenada, Mexico, while her

Case No.

daughter watched TV in the living room and her husband was working in the yard. Two individuals walked into Ms. Martin's home unannounced and uninvited, finding Ms. Martin's seven year-old daughter alone in the living room.  The girl called for her mother, who was startled to find strangers in her home with her daughter.  One of the two individuals, a male, showed Ms. Martin a Los Angeles Police Department business card.  The other individual, a female, introduced herself as Raquel Aragon.

146.   The two intruders told Ms. Martin that they were private investigators hired by Defendant Naasón's criminal defense team, and that they understood that she intended to testify as a witness in his criminal trial.  They proceeded to make vaguely threatening comments about the "international" nature of the case, reminding Ms. Martin that LDM was a "powerful institution" and that Defendant Naasón was a "powerful man" with a "lot of money."  Ms. Martin informed the two that she still intended to testify.  Ms. Martin's husband asked the male investigator for a copy of the Los Angeles Police Department business card that he had shown Ms. Martin.  The man declined to provide a business card, at which point Ms. Martin's husband escorted them from the property.

147.   Ultimately, for their own safety, Ms. Martin and her family were forced to leave their home in Ensenada, Mexico, and move to California, leaving behind everything they knew of their life, including her daughter's friends and their family pets.  Even in California, Ms. Martin has faced no end of public admonishment from LDM members.

148.   On or about August 28, 2019, Ms. Martin was having lunch with another former LDM member at a Chick-fil-a restaurant in Pasadena, California. Ms. Martin's lunch companion was a minor female who had also been sexually abused by Defendant Naasón.  While they were eating, Ms. Martin noticed a man outside of the restaurant filming her on his mobile phone.  Ms. Martin recognized the man as Yobani Chacon, a known lawyer for LDM who lived in Pasadena.  Ms.

Martin took her lunch companion into the restaurant bathroom, where they waited until Mr. Chacon entered the restaurant.  Ms. Martin's companion left out of the back entrance, and Ms. Martin approached the restaurant manager to explain that they were being followed by Mr. Chacon.

149.   Once identified, Mr. Chacon turned around and left the restaurant. Ms. Martin's husband and a family friend were waiting in their car in the restaurant parking lot.  Ms. Martin's husband confronted Mr. Chacon and told him not to follow his wife or minors.  Mr. Chacon took out his mobile phone and pointed it at Ms. Martin, stating loudly "streaming live – Sochil Martin, first conspirator against the light of the world."  Ms. Martin's husband told Mr. Chacon to leave and escorted Mr. Chacon back to his car, which had the license plate "LAW4LDM."

150.   In December 2019, Ms. Martin and her family were residing in a long-term hotel.  The location of the long-term hotel and the family were protected information, which the family had not shared with other LDM members out of fear for their safety.  Knowing from public reporting that people who had previously attempted to leave LDM and expose its secrets had been brutally attacked, Ms. Martin and her family remained on high alert.

151.   On or around December 4, 2019, Defendant David Mendoza, a known strong-man in Naasón's employ, tracked down Ms. Martin's whereabouts, and took up residence in the same hotel as Ms. Martin for several days.  On December 7, 2019, Defendant David Mendoza – who Ms. Martin has known since she was sixteen and knew to be the man nicknamed "The Enforcer," and a Naasón henchman – waited for Ms. Martin in the parking lot of her hotel.  Ms. Martin, who was with her seven year-old daughter at the time, walked out of the side door of her hotel towards her car.  Mendoza stood near Ms. Martin's car, speaking on his mobile phone.  Ms. Martin was standing about six feet away from Mendoza when she recognized him and heard him say "Yeah, she's here.  I see her."  Ms. Martin recalls Mendoza making eye contact with her and displaying a menacing look.  Ms. Martin

1  quickly turned away and sought help from hotel management.

2      152.   Terrorized by the appearance of a known henchman, Ms. Martin called

3  the San Diego police, who discovered that Mendoza had been staying in the hotel

4  for several days before approaching Ms. Martin.  With the knowledge that her and

5  her family's whereabouts were no longer safe and that LDM leadership was still

6  actively attempting to silence her, Ms. Martin packed up her family.  The family

7  was once again forced to flee and find new accommodations.  The experience has

8  had a significant impact on Ms. Martin's well-being and that of her family.  Ms.

9  Martin continues to live in fear.

10      153.   After moving to California, Ms. Martin and her husband discovered

11  that, despite what they were told, LDM never filed paperwork in recognition of their

12  marriage.  In fleeing Mexico, Ms. Martin's husband left behind a prestigious job and

13  their family home.  Due to LDM's lies regarding their marital status, Ms. Martin's

14  husband was ineligible upon their move to apply for a change in immigration status,

15  and subsequent work authorization.  Ms. Martin and her husband are only now, in

16  the wake of this information, able to start taking steps to rebuild their life.

17      154.   Without any sense of financial or personal security, Ms. Martin has

18  been unable to seek any measure of the physical and mental healthcare that she

19  desperately needs in order to move forward from her lifetime of abuse and

20  trafficking.  Even though Ms. Martin, with the help of her husband, gathered the

21  courage to leave LDM in 2016, she still suffers from the psychological effects of a

22  lifetime of sexual exploitation, spiritual manipulation, and trafficking.  Ms. Martin

23  has emotionally struggled to obtain a normal life for herself and her family, which

24  LDM continues to attempt to sabotage.  As such, Ms. Martin was not emotionally or

25  psychologically healthy enough to bring this lawsuit prior to late 2019.

26      155.   By virtue of a lifetime of brainwashing at the hands of LDM,

27  Ms. Martin spent her entire adult life believing that the crimes being perpetrated

28  against her were acts in furtherance of God's will.  Defendants deliberately coerced

Ms. Martin and other LDM members into believing that their suffering was not actual suffering, but service to God's chosen Apostle. Only upon her escape from LDM in late 2016 did Ms. Martin even begin to discover the myriad injuries that Defendants had caused her.

156. As a direct and proximate result of a lifetime of abuse, trafficking, and exploitation at the hands of Naasón, LDM, and its leadership, Ms. Martin has suffered and continues to suffer a litany of injuries. Among other injuries, Ms. Martin has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

## FIRST CLAIM FOR RELIEF

### Involuntary Servitude in Violation of 18 U.S.C. § 1584

*(Defendants LDM, Naasón Joaquín García, el Consejo de Obispos, CCB, Gilberto García Granados, Jose Hernandez, Uzziel Joaquín, Silverio Coronado, Aurelio Zavaleta, Jose Luis Estrada, Jonathan Mendoza, and Does 1-6)*

157. Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

158. Ms. Martin brings this claim for relief under the private cause of action provided by 18 U.S.C. § 1584, which prohibits involuntary servitude.

159. Ms. Martin is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

160. As alleged herein, the Defendants held Ms. Martin in involuntary servitude.

161. Defendants conspired to compel Ms. Martin to work against her will for their benefit, by the use of force, the threat of force, or the threat of legal, personal, emotional, and spiritual coercion.

162. Defendant Naasón Joaquín García and non-Defendant Samuel Joaquín Flores forced Ms. Martin into involuntary servitude through the application of

sexual battery and brutality.  All defendants forced Ms. Martin into involuntary servitude through a lifetime of coercive conditioning to act for their benefit in fear of severe personal, economic, physical, social, emotional, and spiritual injury.

163.   Defendant Naasón Joaquín García's and non-Defendant Samuel Joaquín Flores's sexual violence was committed in furtherance of the remaining Defendants' conspiracy to obtain labor and financial benefit at no cost to themselves.

164.   Ms. Martin, conditioned from birth to show complete obedience to LDM and the Apostle, was highly vulnerable to the Defendants' control.  The Defendants exploited this vulnerability.

165.   Through such actions, Defendants directed, assisted, conspired, and acted in concert with each other to create and perpetuate a system of involuntary servitude prohibited by 18 U.S.C. § 1584.

166.   As a direct and proximate result of these actions, Ms. Martin has sustained damages, including physical injury, severe emotional distress, and economic losses.

167.   Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorney's fees and other relief that the Court may deem proper.

## SECOND CLAIM FOR RELIEF

### Forced Labor in Violation of 18 U.S.C. § 1589

*(Defendants LDM, Naasón Joaquín García, el Consejo de Obispos, CCB, Gilberto García Granados, Jose Hernandez, Uzziel Joaquín, Silverio Coronado, Aurelio Zavaleta, Jose Luis Estrada, Jonathan Mendoza, and Does 1-6)*

168.   Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

169.   Defendants knowingly obtained Ms. Martin's labor and services by patterns of abusive behavior, and by threats of physical, economic, social, and spiritual harm, as described by the forced labor provisions of 18 U.S.C. § 1589.

170.   Ms. Martin is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

171.   As alleged herein, Defendants held Ms. Martin in forced labor, subjecting her to rape, sexual servitude, and forced unpaid labor for their institutional and private benefit.

172.   Defendants conspired to compel Ms. Martin to work and provide sexual services against her will for their benefit, by the use of force or the threat of force.

173.   Defendant Naasón Joaquín García's and non-Defendant Samuel Joaquín Flores's sexual brutality against Ms. Martin constituted serious harm to compel Ms. Martin to provide forced services.  Defendants' threats of physical, economic, social, and spiritual harm further compelled Ms. Martin to provide forced services to LDM in the form of unpaid labor in service of LDM and CCB.

174.   Defendants directed, assisted, conspired, and acted in concert with each other to create and perpetuate a system of forced labor prohibited by 18 U.S.C. § 1589.

175.   As a direct and proximate result of these actions, Ms. Martin has sustained damages, including physical injury, severe emotional distress, and economic losses.

176.   Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## THIRD CLAIM FOR RELIEF

### Trafficking with Respect to Forced Labor or Involuntary Servitude in Violation of 18 U.S.C. § 1590

*(Defendants LDM, Naasón Joaquín García, el Consejo de Obispos, CCB, Gilberto García Granados, Jose Hernandez, Uzziel Joaquín, Silverio Coronado, Aurelio Zavaleta, Jose Luis Estrada, Jonathan Mendoza, and Does 1-6)*

177.   Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178.   By ordering Ms. Martin to repeatedly travel between and within California and Mexico in order to perform forced labor and engage in sexual servitude for the benefit of Defendants under coercion and threats to her physical, economic, social, and spiritual well-being, Defendants engaged in trafficking of Ms. Martin in violation of 18 U.S.C. § 1590.

179.   Ms. Martin is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

180.   Defendants knowingly developed a systematic practice of trafficking LDM members, including Ms. Martin, to Guadalajara multiple times a year and throughout California on a regular basis to provide coerced and unpaid labor to financially benefit Defendants.  Defendants further financially benefitted from trafficking Ms. Martin throughout Mexico and back to California to perform additional coerced and unpaid labor.

181.   Defendants knowingly developed a systematic practice of trafficking minor children, including Ms. Martin, throughout California and to Mexico on a regular basis to provide sexual services for non-Defendant Samuel Joaquín Flores and Defendant Naasón Joaquín García for their financial benefit.

182.   Defendants knowingly developed a practice of dictating the marriages of LDM members, including Ms. Martin, trafficking Ms. Martin and other LDM members throughout the United States and Mexico in order to boost membership, maintain control over members, and continue practices of psychological and financial coercion that financially benefitted Defendants.

183.   Defendants conspired to compel Ms. Martin to work and provide sexual services against her will for their benefit throughout California and across the Mexican border, by the use of force or the threat of force via coercion and threats to her physical, economic, social, and spiritual well-being.

184.   As a direct and proximate result of these actions, Ms. Martin has sustained damages, including physical injury, severe emotional distress, and

1   economic losses.

2       185.   Plaintiff is therefore entitled to recover damages in an amount to be

3   proven at trial, including attorneys' fees and other relief that the Court may deem

4   proper.

5   ### FOURTH CLAIM FOR RELIEF

6   ### Conspiracy in Violation of 18 U.S.C. § 1594

7   *(All Defendants, including Does 1-10)*

8       186.   Ms. Martin realleges and incorporates by reference each and every

9   allegation contained in the preceding paragraphs as if fully set forth herein.

10       187.   Defendants had an agreement to accomplish human trafficking,

11   peonage, and/or unjust enrichment or to benefit financially from Ms. Martin's

12   services through these unlawful means.

13       188.   Ms. Martin is permitted to bring a civil cause of action under 18 U.S.C.

14   § 1595.

15       189.   Defendants conspired to compel Ms. Martin to work and provide sexual

16   services against her will for their benefit throughout California and across the

17   Mexican border, by the use of force or the threat of force via coercion and threats to

18   her physical, economic, social, and spiritual well-being.

19       190.   Defendants agreed to coerce LDM members, including Ms. Martin, to

20   provide unpaid labor to LDM for their financial benefit.  Each day of Ms. Martin's

21   labor, each instruction to perform labor, the issuance of ID badges and time cards,

22   and each financial transaction made using funds acquired through the unpaid labor

23   of Ms. Martin constitutes an overt act in furtherance of the conspiracy.

24       191.   Defendants agreed to coerce minor children, including Ms. Martin, into

25   providing sexual services to non-Defendant Samuel Joaquín Flores and Defendant

26   Naasón Joaquín García for defendants' financial benefit, using coercion and threats

27   to their physical, economic, social, and spiritual well-being.  Every time a child was

28   brought to non-Defendant Samuel Joaquín Flores or Defendant Naasón Joaquín

García for sexual exploitation was an overt act in furtherance of the conspiracy. Financial benefits conferred upon members of the conspiracy in return for their proffering of children for sexual exploitation are additional overt acts in furtherance of the conspiracy.

192.   Defendants agreed to maintain secrecy regarding the sexual exploitation of Ms. Martin, both as a minor and as an adult, in order to protect their financial benefits.  LDM purports to have a strict policy requiring the mandatory reporting of sexual abuse within the institution.  The failure of any defendant to report Ms. Martin's abuse constitutes an ongoing overt act of the conspiracy on the part of each defendant.

193.   As a direct and proximate result of these actions, Ms. Martin has sustained damages, including physical injury, severe emotional distress, and economic losses.

194.   Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## FIFTH CLAIM FOR RELIEF

### Obstructing Enforcement of the Trafficking Victims Protection Reauthorization Act in Violation of 18 U.S.C. § 1590(b)

*((Defendants LDM, Naasón Joaquín García, el Consejo de Obispos, Gilberto García Granados, Jose Hernandez, Uzziel Joaquín, Silverio Coronado, Aurelio Zavaleta, Jose Luis Estrada, Jonathan Mendoza, and Does 1-6)*

195.    Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

196.    On or about November 2016, persons acting on behalf of Defendants contacted Ms. Martin to silence her and obstruct the investigation of the rapes, sexual servitude, and human trafficking she had suffered at the hands of Defendants.

197.    On or about June 30, 2019, two individuals acting on behalf of Defendants entered Ms. Martin's home without her permission with the intention of

intimidating her and preventing her from serving as a witness against Defendant Naasón in his criminal prosecution for conspiracy to commit human trafficking, extortion, and sexual crimes against minors.

198.   On or about August 28, 2019, a known lawyer for Defendant LDM approached Ms. Martin and another potential testifying witness and attempted to use video footage and vague threats to prevent both Ms. Martin and the other potential witness from testifying against Defendant Naasón in his criminal trial for human trafficking.

199.   On or about December 7, 2019, Defendant David Mendoza, acting on behalf of the other named Defendants, located and approached Ms. Martin with the intention of terrorizing her and scaring her into silence in order to cause her to refuse to serve as a witness against Defendants.

200.   As of at least May 2019, Defendants were fully aware that their conduct was under domestic and international investigation.  Upon information and belief, Defendants were fully aware that their conduct was under investigation in Mexico for many years before this date.

201.   Defendants obstructed and attempted to obstruct, and interfered with the enforcement of the federal prohibition against trafficking, 18 U.S.C. § 1590(a).

202.   Ms. Martin is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

203.   As a direct and proximate result of these actions, Ms. Martin has sustained damages, including severe emotional distress and economic losses.

204.   Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

///

///

///

# SIXTH CLAIM FOR RELIEF

**Benefitting Financially from Trafficking in Persons in Violation of 18 U.S.C. § 1593A**

*(All Defendants, including Does 1-10)*

205.   Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206.   As alleged herein, Defendants knowingly subjected Ms. Martin to involuntary servitude, obtained Ms. Martin's labor and services by patterns of abusive behavior and by threats of physical, economic, social, and spiritual harm, trafficked Ms. Martin for the purpose of obtaining such servitude and labor, and conspired to achieve all of the above results, in order to benefit financially from Ms. Martin's labor and trafficking, in violation of 18 U.S.C. § 1593A.

207.   Ms. Martin is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

208.   Defendants conspired over the course of decades to systematically develop sources of personal financial benefit from directing the unpaid labor of LDM members, gaining favor with the LDM Apostle via human trafficking, and maintaining extreme levels of secrecy among the LDM elite.

209.   Defendants each financially benefitted from Ms. Martin's unpaid labor as recipients of funds from LDM and its leadership.

210.   The non-Apostle Defendants each financially benefitted from Ms. Martin's sexual servitude by gaining personal favor from the various Apostles for maintaining the conditions of her abuse.

211.   Defendants each financially benefitted from Ms. Martin's trafficking as it perpetuated the system of financial favors being given to LDM elite in return for maintaining a constant source of trafficked women for the Apostle's sexual abuse.

212.   As a direct and proximate result of these actions, Ms. Martin has sustained damages, including physical injury, severe emotional distress, and economic losses.

213.   Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## SEVENTH CLAIM FOR RELIEF

**Unpaid Labor in Violation of the Federal Fair Labor Standards Act
29 U.S.C. § 201 *et. seq.***

*(Defendants LDM, CCB, and Does 7-10)*

214.   Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

215.    Ms. Martin brings this claim for relief under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.*, which prohibits any employer engaged in commerce from receiving unpaid labor from employees.

216.   Ms. Martin provided daily and weekly services to Defendants LDM and CCB, such that at all relevant times each of the Defendants was a single employer or joint employer of Ms. Martin within the meaning of 29 U.S.C. § 203(d).  Defendants LDM and CCB never paid Ms. Martin the minimum wage for the services that she provided for them.  During all relevant times, Defendants knew that Ms. Martin was providing labor without pay.

217.   Defendants have violated 29 U.S.C. § 206 by failing to pay Ms. Martin the applicable minimum wage for every compensable hour of labor she performed.

218.   Defendants have violated 29 U.S.C. § 207 by failing to pay Ms. Martin the applicable overtime wages for every compensable hour of labor she performed.

219.   Defendants have violated 29 U.S.C. § 211(c) by failing to make, keep, and preserve specific employment-related records, including records of their employees and of the wages, hours, and other conditions and practices of employment maintained by Defendants.  Defendants have not accurately recorded the actual number of hours that each employee works.  Defendants have failed to keep adequate employment records and have not properly or adequately recorded Ms. Martin's hours worked during her employment.

220.   Ms. Martin estimates that she has worked at least 30,000 hours of unpaid labor for Defendants during her lifetime, including a considerable amount of overtime hours.  This estimate is preliminary and is not intended to preclude, through discovery and trial, a conclusion that Ms. Martin's unpaid work exceeds this amount.

221.   Plaintiff is therefore entitled, under 29 U.S.C. § 216(b) to recover all unpaid wages, an additional equal amount as liquidated damages, all appropriate penalties, and reasonable attorney's fees and costs in amounts to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### Unpaid Labor in Violation of the California Labor Code

*(Defendants LDM, CCB, and Does 7-10)*

222.   Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

223.    Ms. Martin brings this claim for relief under California Labor Code § 1197, which prohibits any employer in the state of California from failing to pay their employees minimum wages for their work, in amounts set by state law.

224.   Ms. Martin is permitted to bring a civil cause of action under California Labor Code §§ 1194(a) and 1194.2(a).

225.   Defendants have violated California Labor Code § 1197 by failing to pay Ms. Martin the applicable minimum wage and overtime wage for every compensable hour of labor she performed.

226.   Defendants have violated California Labor Code § 226.7 by failing to provide Ms. Martin with required meal and rest breaks, compensable according to statutory rates fixed by the Industrial Welfare Commission ("IWC") for all persons employed in the state of California.

227.   Defendants have violated California Labor Code § 1198.5 by failing to make, keep, and preserve specific employment-related records, including records of their employees and of the wages, hours, and other conditions and practices of

employment maintained by Defendants.  Defendants have not accurately recorded the actual number of hours that each employee works.  Defendants have failed to keep adequate employment records and have not properly or adequately recorded Ms. Martin's hours worked during her employment.

228.   Defendants have violated California Labor Code § 203 by failing to pay Ms. Martin all owed wages and compensatory payments at the time of the cessation of her labor, thereby entitling her to recover waiting time penalties equal to thirty days' pay, as established by the IWC Wage Orders.

229.   Ms. Martin estimates that she has worked at least 30,000 hours of unpaid labor for Defendants during her lifetime, including a considerable amount of overtime hours.  This estimate is preliminary and is not intended to preclude, through discovery and trial, a conclusion that Ms. Martin's unpaid work exceeds this amount.

230.   Plaintiff is therefore entitled to recover all unpaid wages, an additional equal amount as liquidated damages, statutory damages, all appropriate penalties and reasonable attorney's fees and costs in amounts to be proven at trial.

## NINTH CLAIM FOR RELIEF

**Violation of Federal Racketeer Influenced and Corrupt Organization ("RICO") Act 18 U.S.C. § 1962(c)**

*(All Defendants, including Does 1-10)*

231.   Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

232.   Ms. Martin brings this claim for relief under the private cause of action provided by 18 U.S.C. § 1984(c), which prohibits violations of the Federal RICO Act insofar as such violation injures any person in his business or property.

233.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

///

234.   The LDM Enterprise, distinct from Defendant LDM, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), organized within individual ministries, funneling into regions governed by individual bishops, and headquartered in Guadalajara, Mexico.  Members of the LDM Enterprise maintain a common purpose of extracting financial and sexual services from LDM followers for their own personal gain under the auspices of liturgical praxis and writings taught by LDM ministers worldwide.  The LDM Enterprise began during the rule of the Apostle Aaron in the mid-twentieth century, and continues with a growing global membership of LDM today.

235.   Defendants have conducted and participated in the affairs of the LDM Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

236.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts:  (i) dealing in obscene matter, in violation of 18 U.S.C. § 1961(1)(A); (ii) violating the prohibition against involuntary servitude under 18 U.S.C. § 1584; (iii) violating the prohibition against forced labor under 18 U.S.C. § 1589; (iv) violating the prohibition against human trafficking under 18 U.S.C. § 1590; (v) engaging in the importation or transportation of obscene material in violation of 18 U.S.C. § 1462; (vi) laundering of monetary instruments outside of the United States with the intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §1956(a)(2); (vii) sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260, and (viii) extortion in violation of California Penal Code § 518.

237.   Each Defendant, in their individual capacity, knew or should have known about the majority of the predicate acts carried out by Defendants within the LDM Enterprise.

///

238.   Upon information and belief, some combination of Defendants have engaged in an uninterrupted course of unlawful conduct consisting of all of the herein described predicate acts since at least the identification of Samuel Joaquín Flores as LDM Apostle, beginning in 1964 through to the present.

239.   The pattern of racketeering activity undertaken by Defendants has served the criminal purposes of multiple schemes by Defendants, including, but not limited to, the systemic sexual exploitation of minors by Defendants, the trafficking of humans for forced labor to financially benefit Defendants, the trafficking of humans for sexual servitude in order to gain financial favor from the Apostle, the extortion of financial payments and sexual favors for financial benefit, and the laundering of money to continue to benefit financially from fraud perpetrated against LDM enterprise members without risking identification by United States tax authorities.

240.   Upon information and belief, several hundred children have been sexually exploited as a result of this pattern of racketeering behavior.

241.   Upon information and belief, many thousands of LDM Enterprise members have been coerced into providing unpaid labor for the financial benefit of Defendants as a result of this pattern of racketeering behavior.

242.   Upon information and belief, hundreds of individuals in the LDM inner circles have been extorted through fear of financial and physical injury into making large financial payments to Defendants and into providing sexual services to Defendants as a result of this pattern of racketeering behavior.

243.   Upon information and belief, many millions of dollars have been trafficked out of the United States for the purposes of carrying on unlawful activity as a result of this pattern of racketeering behavior.

244.   Upon information and belief, Defendants' pattern of racketeering behavior has been related and continuous since its inception.  Upon information and belief, there is not only a threat of continued criminal activity, but continued

1  criminal activity is occurring within the LDM Enterprise at the hands of nearly all

2  Defendants as of the writing of this Complaint.

3      245.  Defendants and the LDM Enterprise regularly move goods, money, and

4  people across state lines, and are therefore engaged in interstate commerce.

5      246.  Ms. Martin is a "person" with standing to sue within the meaning of 18

6  U.S.C. § 1964(c) because Ms. Martin was trafficked between and within the United

7  States and Mexico at the hands of Defendants for purposes of providing forced labor

8  and being subjected to involuntary servitude from ages nine through thirty.

9      247.  As a direct and proximate result of these patterns of racketeering

10 behaviors, Ms. Martin has sustained damages, including lost wages, loss of

11 economic opportunity, loss of educational opportunity, loss of future income, loss of

12 specific extorted payments, physical injury, severe emotional distress, and additional

13 economic losses.

14     248.  Plaintiff is therefore entitled to recover treble the damages she

15 sustained in an amount to be proven at trial, the cost of the suit, plus a reasonable

16 attorney's fee, pursuant to 18 U.S.C. § 1964(c).

## TENTH CLAIM FOR RELIEF

### Sexual Battery in Violation of Cal. Civ. Code § 1708.5

*(Defendants LDM, el Consejo de Obispos, and Naasón Joaquín García)*

20     249.   Ms. Martin realleges and incorporates by reference each and every

21 allegation contained in the preceding paragraphs as if fully set forth herein.

22     250.  Ms. Martin brings this claim for relief under Cal. Civ. Code Section

23 1708.5, which prohibits sexual battery.

24     251.  Ms. Martin brings this claim pursuant to California Assembly Bill 218,

25 amending Sections 340.1 and 1002 of the Code of Civil Procedure and Section 905

26 of the Government Code, relating to childhood sexual assault, reviving until

27 December 31, 2023 the statute of limitations for all previously extinguished claims

28 for damages suffered as a result of childhood sexual assault for victims within 22

years of the age of majority.

252.   As alleged herein, Ms. Martin was the victim of sexual battery as a minor perpetrated by both non-Defendant Samuel Joaquín Flores and Defendant Naasón Joaquín García.  Defendants LDM and el Consejo de Obispos subjected Ms. Martin to this sexual battery at the hands of non-Defendant Samuel Joaquín Flores and Defendant Naasón Joaquín García while Ms. Martin was a minor.

253.   Cal. Civ. Code § 1708.5 prohibits any act with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with the person results, or any act that causes an imminent apprehension of such harmful or offensive contact and the offensive contact results.

254.   Defendants LDM, Naasón Joaquín García, and el Consejo de Obispos knowingly conspired and/or aided and abetted to force Ms. Martin into sexual battery with non-Defendant Samuel Joaquín Flores and Defendant Naasón Joaquín García, and such sexual battery did, on multiple occasions, occur.  Ms. Martin was a minor at all relevant times with regards to non-Defendant Samuel Joaquín Flores, and was a minor during the first two years of sexual battery at the hands of Defendant Naasón Joaquín García.

255.   Each Defendant knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Ms. Martin to be repeatedly subjected to private, egregiously offensive sexual contact with non-Defendant Samuel Joaquín Flores and Defendant Naasón Joaquín García, all in furtherance of sexually battering Ms. Martin.

256.   The sexual battery of Ms. Martin by Defendant Naasón Joaquín García and non-Defendant Samuel Joaquín Flores was the result of Defendants' cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

257.   As a direct and proximate cause of Defendants actions, Ms. Martin has suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

258.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Ms. Martin's rights and safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Ms. Martin.

259.   Plaintiff is therefore entitled to recover treble the amount of damages she sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees, and other relief that the Court may deem proper.

## ELEVENTH CLAIM FOR RELIEF

### Gender Violence in Violation of Cal. Civ. Code § 52.4

*(Defendants LDM, el Consejo de Obispos, and Naasón Joaquín García)*

260.   Ms. Martin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

261.   Ms. Martin brings this claim for relief under Cal. Civ. Code Section 52.4, which prohibits acts of gender violence.

262.   Ms. Martin brings this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the California Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

263.   As alleged herein, Ms. Martin was the victim of multiple instances of sexual battery as a minor perpetrated by both non-Defendant Samuel Joaquín Flores and Defendant Naasón Joaquín García.  Defendants LDM and el Consejo de Obispos subjected Ms. Martin to these multiple incidents of sexual battery at the hands of non-Defendant Samuel Joaquín Flores and Defendant Naasón Joaquín García while Ms. Martin was a minor.

264.   Cal. Civ. Code § 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

265.   As alleged herein, between the ages of twelve and eighteen, Ms. Martin was repeatedly the victim of acts of gender violence.

266.   Each Defendant, including Defendant Naasón Joaquín García, knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Ms. Martin to be repeatedly subjected to private, egregiously offensive sexual contact with non-Defendant Samuel Joaquín Flores and Defendant Naasón Joaquín García, all in furtherance of committing acts of gender violence against Ms. Martin.

267.   The repeated sexual battery of Ms. Martin by Defendant Naasón Joaquín García and non-Defendant Samuel Joaquín Flores was the result of Defendants' cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

268.   As a direct and proximate cause of Defendants actions, Ms. Martin has suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

269.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Ms. Martin's rights and safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Ms. Martin.

270.   Plaintiff is therefore entitled to recover treble the amount of damages she sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees and other relief that the Court may deem proper.

1

**PRAYER FOR RELIEF**

2          WHEREFORE Plaintiff Sochil Martin respectfully prays for relief as follows:

3                  (a) Compensatory and special damages in an amount to be proven at

4                       trial;

5                  (b) Unpaid wages, including minimum wages and overtime

6                       premiums, in an amount to be proven at trial;

7                  (c) Statutory penalties and liquidated damages according to proof at

8                       time of trial;

9                  (d) Punitive and exemplary damages in an amount according to

10                      proof at the time of trial;

11                 (e) Treble damages under 18 U.S.C. § 1964(c) and California Code

12                      of Civil Procedure 340.1(b)(1);

13                 (f) Pre- and post- judgment interest;

14                 (g) Reasonable attorney's fees and costs; and

15                 (h) Such other and further relief as the Court deems just and proper.

16         Plaintiff respectfully demands a trial by jury on all claims so triable.

17

18   DATED: February 12, 2020          GREENBERG GROSS LLP
                                        Deborah S. Mallgrave
19                                      Joshua M. Robbins

20

21                                      JEFF ANDERSON & ASSOCIATES
22                                      Michael Finnegan
                                        Jennifer E. Stein
23

24

25                                      By: _____

26                                          Deborah S. Mallgrave
                                            Attorneys for Plaintiff SOCHIL MARTIN
27

28