# **DECLARATION OF ALAN J. JACKSON**

I, Alan Jackson, declare:

1. I am a partner at the law firm of Werksman Jackson & Quinn LLP, counsel for Defendant Naason Joaquin-Garcia ("Mr. Garcia"). My firm represents Mr. Garcia both in this case ("Civil Case") and in the pending criminal prosecution against Mr. Garcia ("Criminal Case"). I make this declaration from personal knowledge, and if called as a witness I could and would testify competently to the facts set forth herein, unless otherwise specified that such facts are based on information and belief. My purpose in making this declaration is to provide background for the Court on the pending Criminal Case, and my concerns about collusion between civil plaintiff Sochil Martin and the prosecutors in the Criminal Case, in support of Mr. Garcia's opposition to Plaintiff's motion to strike Mr. Garcia's answer in the civil case.

2. Mr. Garcia is a defendant in a criminal case brought by the state Attorney General's office. Attached hereto as **Exhibit 1** is a true and accurate copy of the operative Amended Complaint. Mr. Garcia is one of four defendants in that case; the other three are Alondra Ocampo, Susana Oaxaca, and Azalia Rangel. None of the other three criminal defendants is a defendant in this Civil Case.

3. The Criminal Case began with a press conference by Attorney General Javier Becerra on June 6, 2019. He made numerous inflammatory comments about the La Luz Del Mundo religion as a whole (e.g., that it was engaged in "brainwashing," that it and its leaders were "sick" and "demented" and that that it did not deserve to be called a "church" or a "religion." Attached as **Exhibit 2** is a transcript of Mr. Becerra's press conference.

4. Following that press conference, the prosecution argued to the court that Mr. Garcia should be held without bail. The prosecutors (Deputy Attorneys General Amanda Plisner and Diana Callaghan) claimed that evidence on numerous electronic devices seized by the prosecution would reveal hundreds of victims and

thousands of images and videos of child pornography. They have repeated that claim on multiple occasions over the past year, but have failed to identify any such evidence. The original complaint alleged only four "Jane Doe" victims, but the prosecutors based their bail arguments on claims that they expected to find far more evidence. They claimed at the bail hearing that they were actively continuing to seek out and identify additional victims and that they expected to find dozens or even hundreds more. They have, in the year since the bail hearing, not identified a single new additional victim.  The prosecutors also claimed, without any evidence, that Mr. Garcia would intimidate and threaten witnesses if he were released or if he gained access to the prosecution's evidence. He remains in custody to this day having been held for more than a year without bail.  However, the prosecution has never presented any evidence of any kind in support of their bare allegations of potential threats or intimidation. I have asked the prosecutors to provide such evidence if it exists. They have not done so. And it is clear that there has been none in the year since Mr. Garcia's arrest and incarceration. The prosecution has never identified any such allegation, nor have they added any charges related to such conduct.

5. The prosecutors, Ms. Callaghan and Ms. Plisner, have stated on multiple occasions to me and my colleagues on the defense team that their hope and intention is to prosecute the Criminal Case all the way through trial without ever disclosing to the defense the identity of a single accuser or witness in the case.  My colleagues and I were surprised that a prosecutor would express such an intention; I was a Deputy District Attorney for 18 years, and left the office as the Assistant Head Deputy of the Major Crimes Division.  I have participated in and supervised the litigation of hundreds of serious criminal prosecutions.  I have never and would never even contemplate trying a case while keeping secret from the defendant the identity of his or her accusers and/or the witnesses giving evidence against him.  Such a tactic contravenes constitutional, statutory, and ethical principles of justice and fairness about which I care deeply.  Because the Criminal Case has been

litigated in the Court of Appeals since last September, and has not yet been remanded back to the Superior Court for dismissal (and, per the prosecution, re-filing), we have not yet had the opportunity to litigate the prosecution's stated position, that they will never disclose the identities of Mr. Garcia's accusers. I anticipate that a court will reject the prosecution's position on that matter.

6. Months later (in September and October 2019), the defense was for the first time able to access many of the electronic devices in the prosecution's possession. This review revealed that the key representations made by Attorney General Becerra and by the prosecutors (Amanda Plisner and Diana Callaghan) at the July 15 and 16 evidentiary bail hearings—both as to their claim that an ongoing investigation would reveal "additional victims" and that "thousands of images" and videos of child pornography would be discovered once the data on seized devices was reviewed— have no basis in fact.

7. In fact, in the year since Mr. Garcia's initial arrest, the prosecution brought *no* additional sexual assault charges, identified *no* additional victims of alleged sexual assault, and brought no charges or allegations of any kind alleging any sort of witness intimidation or obstruction. This is especially noteworthy because the government has made aggressive efforts during that year to reach out to the greater community in an attempt to discover additional alleged victims and additional evidence against Mr. Garcia.  Those efforts have proven futile, as no new evidence or victims has been identified. The prosecution initially withheld the seized electronic evidence from the defense, resulting in a contempt order and individual sanctions of $5000 each against the prosecutors in September 2019, for failing to comply with the Superior Court's order to provide the defense access.  The Superior Court withdrew the contempt sanction after the prosecution brought the seized electronic devices to the courtroom as the Court had ordered.  The prosecution continues to withhold significant amounts of evidence, an issue which we will litigate when the prosecution re-files.

8. My review of the prosecution's investigative reports reveals that the prosecutors and their agents have interviewed dozens of current church members, and coordinated extensively with disavowed former church members (including Sochil Martin) who have seemingly devoted their lives to publicly attacking the church and removing Mr. Garcia from his office, and with Julie Duvall, a property owner in Georgia who has engaged in a campaign to damage the church's reputation because she objects to the opening of an LLDM church in her neighborhood in suburban Atlanta. The reports suggest that Ms. Plisner and the prosecution team was actively meeting with Ms. Martin as early as December 2018.

9. Despite these months-long, ongoing efforts, the sexual assault charges remain exactly as they were in the initial complaint, with four alleged victims, none of whom cross-corroborate any others.

10. The People have refused to identify any of the four complaining witnesses, whom they refer to only as Jane Does, but it is readily apparent that Sochil Martin is not one of them. Three are identified as minors (or young adults now), significantly younger than Ms. Martin. A reading of the reports suggests that Jane Doe 4, an adult, is someone who was formerly in a high-level position in the church, but was removed from that position. She formerly had a close relationship with Mr. Garcia, and blames him and others in the church for the loss of that relationship. She is obsessed with Mr. Garcia and is determined to hurt him to seek "revenge." One of the prosecutors, Amanda Plisner, has had numerous personal communications with this individual, including phone, text, email, WhatsApp, and in-person communications, without any agent or witness present. The nature and extent of these communications, along with potential inducements offered by the prosecutors for this individual's cooperation, call into serious question the objectivity of the prosecution and the reliability of her allegations. This individual is also the government's *only* basis for believing that certain images contain underage pornography.

11. Sochil Martin, the plaintiff in the Civil Case, filed her lawsuit on February 12, 2020. That same day, she held a televised press conference, flanked by her attorneys Joshua Robbins, Deborah Mallgraves, and Jeffrey Anderson. I watched that press conference. Attached hereto as **Exhibit 3** is a true and accurate transcript, prepared by my office, of the press conference.

12. It is evident from the prosecution's reports that the prosecutors, particularly Amanda Plisner, have had a close relationship with Ms. Martin, including meetings, phone calls, emails, and text messages, since at least the fall of 2018. Ms. Martin's allegations, however, as they appear in her Complaint in this Civil Case, do not appear anywhere in the Criminal Complaint.

13. Regarding the child pornography charges, the prosecutors told the Superior Court in the June and July hearings that they had seized dozens of devices and that they believed the devices contained thousands of images of child pornography, revealing a large-scale, institutional operation that victimized potentially hundreds of girls throughout the state and abroad. However, from the 62 seized devices, containing hundreds of thousands of files, the prosecution is able to point to *only five identified images* that it claims it will use in furtherance of its presentation of evidence in this case. I know this because on October 25, 2019, I directly asked the prosecution to inform me of the specific images the prosecution "propounds as evidence in this case." DAG Diana Callaghan, in response, identified the following five images. I have reviewed those images listed and I know what they depict. The images do not, in my opinion, come close to providing probable cause for any of the charges in the Complaint. (And there has not yet been a preliminary hearing.)

14. Those five images are the entirety of what the prosecution has identified as evidence of any crimes on the electronic devices, despite multiple requests from Mr. Mason and from me that the prosecution do so. It is an understatement to note that the evidence reveals nothing even remotely akin to the "thousands of images," "hundreds of victims," and global cabal of human trafficking alleged by Mr.

Becerra and Ms. Martin. Moreover, there is inadequate evidence connecting Mr. Garcia to the devices or the images the prosecution claims are criminal. (The prosecution seized 62 electronic devices from multiple locations, containing hundreds of thousands of image files.) In sum, the prosecution's public claims about the evidence against Mr. Garcia have been wildly exaggerated since the start of this case. On examination, the government's evidence does not come close to the grandiose claims made at the July bail hearings, or publicly in the Attorney General's press conference.

15. On or about September 26, 2019, my office moved to dismiss the Criminal Case for failure to timely prosecute, on the grounds that the prosecution failed to provide Mr. Garcia with a timely preliminary hearing despite holding him in custody without bail. We litigated this issue in the Superior Court and subsequently in the Court of Appeal. On April 7, 2020, the Court of Appeal granted our petition and ordered the case dismissed. Because of the COVID-19 pandemic, the California Supreme Court has delayed the finality of Court of Appeal decisions. We anticipate, based on the current orders, that the remittitur will be issued to the Superior Court on or about July 8, 2020. The Attorney General's Office has stated that it intends to file a new criminal complaint immediately following dismissal.

16. I am concerned that the prosecution in the Criminal Case is actively colluding with Ms. Martin and her civil attorneys to use this Civil Case to obtain leverage in the Criminal Case and/or evidence that it could not otherwise get in the Criminal Case. We know—because the government's own investigation reports document the contacts—that Ms. Martin was directly involved with persuading the Attorney General's Office to bring charges, by attempting to recruit witnesses and victims in online forums and by phone solicitations, and in introducing the prosecutors to potential victims or witnesses to interview. It appears that the Attorney General's Office and Ms. Martin and her civil counsel attempted to use the Civil Case to

attempt to force Mr. Garcia to provide evidence, by suing numerous family members and church associates of his (with what we believe are factually and legally insufficient basis), so that Mr. Garcia would not move for a stay, which would prevent those family members and associates from clearing their names; and then by moving to strike Mr. Garcia's answer and prevent him from asserting his Fifth Amendment rights.

17. On May 26, 2020, my co-counsel wrote to Plaintiff's counsel in an attempt to schedule the mandatory Rule 26(f) initial discovery conference of counsel. Ms. Mallgraves responded the same day, in writing, refusing to schedule the conference, claiming it was "premature" even to discuss it. On May 27, 2020, from approximately 1:30-2:30 p.m., the parties held a teleconference regarding Defendants' request to hold a Rule 26(f) initial discovery conference (as required by the Rules of Civil Procedure and this Court's scheduling order), Plaintiff's refusal to participate or agree to a date, and Defendant's contemplated motion to address Plaintiff's refusal. During that call, Plaintiff's counsel, Ms. Mallgraves, stated that the latest possible date, based on this Court's initial Scheduling Conference set for September 14, 2020, see Doc. 39, would be 21 days prior thereto, or August 21, 2020, and that Plaintiff would commit only to participating the Rule 26 conference "by that date." Defense counsel drew her attention to this Court's Scheduling Order, and to the language of Rule 26(f). Ms. Mallgraves repeatedly refused to discuss the scheduling conference at all. She refused to discuss setting a date, and reiterated that Plaintiff would not agree to participate in the conference, or participate in discussions for setting a date for it. Ms. Mallgraves stated that she would consider setting a date for the Rule 26(f) conference only in exchange for a stipulation by counsel for Defendant Garcia that Mr. Garcia would personally accept service on behalf of the entire LLDM religious denomination, what she referred to as "LLDM itself," and which is characterized in the lawsuit as an "unincorporated association." I and my co-

counsel explained that her demand was improper under Rule 26, and made no sense, because "LLDM itself" is a religious movement, not a legal entity. I explained that naming "LLDM" as a defendant is akin to naming "Catholicism" as a defendant. Defendants' counsel explained that just as in the numerous cases involving alleged sexual abuse by Catholic priests, plaintiffs cannot simply write in the name of a worldwide religious denomination as a defendant; they must sue actual legal entities and individuals. I and my co-counsel noted that Plaintiff is obviously aware of this fact as well, because she sued multiple individuals and entities in this case, and has retained as putative lead counsel, Mr. Jeffery Anderson (who is listed first on the docket and on the complaint, but has not participated in any calls, emails, or letters), who bills himself as the world's leading plaintiff's attorney for lawsuits against Catholic officials and entities, and who has brought hundreds of lawsuits against Catholic officials and entities. I have personally reviewed examples of Mr. Anderson's complaints filed against Catholic officials and entities regarding alleged sexual abuse, and confirmed that in those cases, he does not name "Catholicism" as a defendant; rather, he sues individual priests, bishops, and dioceses. Ms. Mallgraves reiterated that unless Mr. Garcia would stipulate to accept service on behalf of "LLDM itself," Plaintiff would continue to refuse to schedule or participate in a Rule 26(f) conference. Attached hereto as **Exhibit 4** are three examples of complaints signed by Mr. Anderson alleging sexual abuse by Catholic priests and/or coverups by Catholic officials.

18. The call ended at approximately 2:30 p.m. co-counsel, Mr. Aljian, informed Ms. Mallgraves that Defendants would file a motion regarding the Rule 26(f) conference. At 4:47 p.m. that same day, May 27, 2020, I received an email from Deputy Attorney General Donna Dean, informing me that the AG intended to move to intervene in the Civil Case, to request a stay of discovery. The following day, May 28, at 6:49 p.m., I received an email from Ms. Mallgraves informing me that Plaintiff intended to make a motion to strike Mr. Garcia's answer. I wrote

back approximately one hour later, stating that I was willing to discuss the proposed motion, but requested that Ms. Mallgraves provide a written explanation of the legal basis for it.  This was the first time Plaintiff's counsel had ever indicated that they had any concerns about the Answer, which had been filed on May 19.  Ms. Mallgraves responded the following day, and Mr. Mason then wrote back to her, proposing that the parties hold their discussion on Wednesday, June 3, when we had our teleconference already set with the AG's office.

19. The parties held a teleconference on June 3, 2020, regarding Plaintiff's Motion to Strike and the AG's Motion to Intervene.  Present on the call, in addition to counsel for the parties, were Deputy Attorney General Donna Dean, and Supervising Deputy Attorney General Mark Cumba, who introduced himself as "a supervisor from Sacramento." Mr. Aljian asked whether Plaintiff and the AG were communicating and coordinating their efforts, including whether Plaintiff and her counsel coordinated with the AG's Office in the preparation and filing of the Civil Case; when the AG's Office learned of the filing of the Civil Case; and what communications they've had since the filing of the Civil Case. Ms. Mallgraves and Ms. Dean both repeatedly refused to answer all such questions, asserting first that all communications between the AG's office and Plaintiff's counsel were "attorney-client privilege" or "work product." Mr. Aljian, Mr. Neri, and I questioned the viability of such a claim (viz., Ms. Martin is not the AG's client, the AG is not Plaintiff's counsel's client, and neither is co-counsel with the other on any matter). Ms. Dean then stated: "These are all collateral side issues that are not relevant.  They have nothing to do with the motion." Mr. Mason stated that coordination between Ms. Martin's counsel and the AG was highly relevant to the Fifth Amendment issues Ms. Martin put in issue with the instant Motion to Strike, and Mr. Aljian stated that as to the timeliness of the AG's motion to intervene. Mr. Aljian and I suggested that Ms. Mallgraves and Ms. Dean should in good faith answer the questions, given the motions each of them had brought.  Both Ms.

Mallgraves and Ms. Dean then stated that they simply refused to answer any such questions, without giving any additional reasons. After the call concluded, Mr. Neri sent a preservation letter to the AG and Plaintiff's counsel, demanding preservation of all communications between and among them.

20. In that teleconference, Mr. Robbins stated that he understood the Fifth Amendment, agreed that Mr. Garcia had a valid basis for asserting it, and stated, "If it were me in your place, I would do the same thing." He then stated that Plaintiff only sought answers to "a couple paragraphs going to jurisdiction and venue." He repeated that phrase several times. I and my co-counsel asked him to specify the paragraphs he was referring to, but he said he could not do that on the call. I and my co-counsel asked him why, if all Plaintiff was concerned about was "a couple paragraphs going to jurisdiction and venue," Plaintiff was moving to strike the entire answer. Mr. Robbins said that Plaintiff had no such intention and that he would email us with the "couple paragraphs" for which Plaintiff wanted answers. He insisted that he "knew the Fifth Amendment," and was certain that there were "no Fifth Amendment implications" and "no danger" to Mr. Garcia in providing a substantive Answer. I and my co-counsel then asked the AG attorneys on the call whether the AG agreed with that assessment, and whether the AG would commit to not seeking to use against Mr. Garcia any Answer he filed. DAG Dean stated: "We're not making any such commitment."

21. Following the parties' June 3, 2020 meet-and-confer teleconference, Plaintiff's counsel sent to Mr. Mason and me a list of 58 enumerated paragraphs from the Complaint to which Plaintiff demanded an answer, and claimed did not implicate the Fifth Amendment. Attached as **Exhibit 5** is that list. Those paragraphs concern, inter alia, the organizational structure of LLDM and Mr. Garcia's position in it, including his responsibility for the actions of others, which is precisely the theory of liability in the criminal case. And many of them, including, e.g., ¶¶ 158, 159, 170, 179, 188, 202, 207, 215, 216, 217, 218, 219, 220, 221, 223-

    230, 232, 250, 251, 261, 262, and 264, demand expressly that Mr. Garcia admit or deny whether Ms. Martin may properly sue him under statutes that directly require, as an element, criminal conduct.

22. Attached as **Exhibit 6** is the relevant correspondence on the issues discussed herein between me and the Attorney General's Office.

The foregoing is true and correct to the best of my knowledge and belief, under penalty of perjury under the laws of the United States and the State of California. Executed this date of June 22, 2020, at Los Angeles, California.

                                                    ___/s/ *Alan J. Jackson*_____
                                                    ALAN J. JACKSON